[Crim. No. 8644. In Bank. Oct. 22, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. RANDOLF WILLIAMS and NATHANIEL HENDRIX, Defendants and Appellants.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

454

Donald C. Duchow for Defendants and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Albert W. Harris, Jr., and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

TOBRINER, J.—A jury found defendants guilty of second degree murder in connection with the stabbing of George Mack. They appeal from the judgment of conviction.

George Mack died as a result of a knife wound shortly after an affray with defendants on the morning of May 26, 1963. Defendants, residents of Oakland, drove to San Francisco on Saturday, May 25. They visited various parts of the city, ending up at Third and Tehama Streets late on Sunday morning. There they saw Mack whom they knew as a supplier of methedrine. Apparently Mack owed Hendrix some money; defendants attempted either to obtain methedrine from Mack in discharge of the debt or to convince Mack to repay the money that he owed Hendrix. The discussion relating to these matters degenerated into an affray which resulted in Mack's death.

The record does not spell out the exact sequence of events. In essence defendants contend that Mack pulled out a knife, that they used their knives only to defend themselves, and that in the struggle which ensued Mack was stabbed. No prosecution witness saw the beginning of the affray. After the stabbing defendants left the scene and returned to Oakland. The following day they turned themselves over to the police.

Defendants contend that the evidence establishes, as a matter of law, that they acted in self-defense; that the trial court erred in instructing the jury in several respects; that certain of the trial judge's remarks were prejudicial, and that the trial court erred in admitting into evidence statements which were obtained in violation of defendants' rights to counsel and to remain silent.

As we explain below, we conclude that the evidence does not

demonstrate self-defense as a matter of law; we further hold that the trial court prejudicially erred in instructing the jury that it must find defendants guilty of second degree murder if the killing occurred during a conspiracy to obtain methedrine; we finally direct that on retrial the trial court inquire into the circumstances surrounding defendants' statements to determine whether those statements were taken in violation of the principles enunciated in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. We need not consider whether the trial court's remarks to the jury were prejudicial.

I. *Sufficiency of the evidence*

We cannot accept defendants' first contention that the evidence, as a matter of law, establishes that they acted in self-defense. Defendants argue that their extrajudicial statements to the police, which the prosecution introduced at trial, showed that they acted in self-defense and that the prosecution is "bound" by these statements.[1]

In *People* v. *Acosta* (1955) 45 Cal.2d 538, 542-543 [290 P.2d 1], we stated the rule for determining if the prosecution is "bound" by extrajudicial statements it introduces: ". . . if there is prosecution evidence which tends to disprove criminality and other prosecution evidence which tends to prove criminality, it is the function of the trier of fact to determine which version is to be believed. [Citations.]

The courts may sometimes say the prosecution is 'bound by' extrajudicial statements of defendant which are introduced by the prosecution and which are irreconcilable with guilt, but this concept is applicable only where there is no competent and substantial evidence which could establish guilt. [Citations.]"

In this case other "competent and substantial evidence" tends to prove that the defendants did not act in self-defense. Admittedly the prosecution introduced no direct evidence which explained how the argument degenerated into physical violence. But from the circumstances, including the

---

[1]As related by Inspector Sutton, who took the statements and testified at trial, defendants' statements varied somewhat in explaining precisely what took place during the affray. In view of the other evidence which tends to disprove their story, however, the variations between defendants' statements are not crucial. It is arguable, however, that the prosecution is not, in any event, bound in a situation in which the defendants' statements vary substantially.

fact that both defendants were physically larger men than Mack, the jury could have found that defendants did not kill Mack as a result of their reasonable fear of a present danger of great bodily injury. (See Pen. Code, § 197, subd. 3.)

The prosecution's witness, Mr. Miles, testified that he was about 200 feet from the altercation; that he saw a crowd watching a commotion; that when the crowd backed up he saw Williams kick Mack, who was then ''sliding down the wall.'' Mr. Cotney, standing fairly close to the affray, testified that he saw defendants ''scuffling'' with Mack and that the defendants ''had him down.'' He heard Mack say, ''I will give it to you.'' He also testified that the only knife he saw was in Williams' hand.[2]

Mrs. Ritchie, landlady at the Yukon Hotel, testified that she heard Rose Johnson scream from the street, ''Why don't you two people let this man alone. You are going to kill him.'' She later looked down from her window in the hotel and saw, on the sidewalk beneath the window, the defendants on either side of Mack. She stated that they were all standing up and that Mack ''looked like he was helpless.'' She testified she saw a ''knife come out like that in a thrust with the blood dripping from it.''

Defendants apparently recognize the damaging effect of Mrs. Ritchie's testimony. They contend that the jury must have rejected her testimony because they did not find defendants guilty of first degree murder under the felony-murder doctrine. (Pen. Code, § 189.) Although some of Mrs. Ritchie's testimony tended to show that defendants were robbing Mack, that is not the only inference the jury might have drawn from the evidence. Defendants' contention must therefore fail.

II. *Erroneous instructions*

 Defendants object to the trial court's rulings on proffered instructions as to the law of self-defense and on the rendered instructions as to the second degree murder rule; we shall explain why we have concluded that defendants'

---

[2]Mack's knife remains somewhat of a mystery. Neither side introduced it into evidence. Inspector Sutton, the only investigating officer to testify, was asked what ''personal effects'' were ''found on Mack's person when the body was picked up.'' He answered that a notebook, some pills and a few pennies were found. He did not mention a knife. He did not arrive at the scene of the crime, however, until about an hour after the stabbing. Mr. Andrews, a defense witness who arrived at the scene sometime after noon, admitted on cross-examination that he did not see a knife at the scene.

latter contention compels reversal. As to the former we need only state that the court's instructions on self-defense adequately apprised the jury of the matters which defendants' suggested instructions sought to present; the court did not err in rejecting them.

As to the latter, the trial court instructed the jury that the defendants would be guilty of murder in the second degree if "the killing [was] done in the perpetration or attempt to perpetrate a violation of section 245a of the Penal Code, assault with a deadly weapon, or in the violation of Section 182 of the Penal Code, conspiracy."[3] This instruction unduly broadens the felony-second-degree-murder rule and does not accord with our recent cases.

■ This court has expressed the nature and extent of the felony-second-degree-murder rule in *People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892]: "A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes at least second degree murder. (*People* v. *Poindexter* (1958) 51 Cal.2d 142, 149 [5, 6] [330 P.2d 763] [administering narcotics to a minor]; *People* v. *Powell* (1949) 34 Cal.2d 196, 205 [7] [208 P.2d 974] [abortion]; cf. *People* v. *McIntyre* (1931) 213 Cal. 50, 56 [4] [1 P.2d 443] [drunk driving].)" See also the recent cases of *People* v. *Schader* (1965) 62 Cal.2d 716, 732 [44 Cal.Rptr. 193, 401 P.2d 665], and *People* v. *Washington* (1965) 62 Cal.2d 777, 780-781 [44 Cal.Rptr. 442, 402 P.2d 130], in which we approved and followed the *Ford* formulation.[4]

---

[3]Taken in context it is clear that the involved conspiracy constituted a conspiracy to possess methedrine without a prescription. Business and Professions Code section 4230 declares unlawful the possession of methedrine without a prescription. A violation of that section is a misdemeanor. (Bus. & Prof. Code, § 4235.) Conspiracy to commit a misdemeanor is a felony. (Pen. Code, § 182.)

[4]This formulation of the second-degree-felony-murder rule has been commended by the commentators (see Moreland, The Law of Homicide (1952) 224; Perkins, *A Reexamination of Malice Aforethought* (1934) 43 Yale L.J. 537; see also Pike, *What is Second Degree Murder in California?* (1936) 9 So. Cal.L.Rev. 112, 118-119). (See also Model Penal Code [Proposed Official Draft, May 4, 1962] art. 210, especially section 210.2.)

Moreover, as we recently stated in *People* v. *Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130], "The purpose of the felony murder rule is to deter felons from killing negligently or accidentally. . . ." This purpose may be well served with respect to felonies such as robbery or burglary, but it has little relevance to a felony which

458

▮▮ The felony involved in this case, conspiracy to possess methedrine, is surely not, as such, inherently dangerous. The trial court erred, therefore, in instructing the jury it might convict the defendants of second degree murder on the basis of the felony.[5]

▮ Furthermore, the erroneous instruction caused prejudice to defendants. Although the jury, even in the absence of the erroneous instructions, would probably not have completely exculpated defendants, it could well have found defendants guilty of voluntary manslaughter.

The record convinces us that, if the court had not given the questionable instruction, the jury would have found defendants guilty of at least some offense. The court adequately instructed the jury on self-defense; the jury's guilty verdict demonstrated that it did not accept that exoneration. Nor could the jury have exculpated defendants upon the basis of section 195, subdivision 2, of the Penal Code which excuses homicides "upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used"; defendants, in the combat, here, used knives.

The prejudicial vice of the instruction lay in the fact that it precluded the jury from finding defendants guilty of voluntary manslaughter. The trial judge instructed the jury that "if [the conspiracy to possess methedrine] is being perpetrated and there is a killing in connection with it, it is second degree murder, even though the killing was accidental." Voluntary manslaughter consists of the unlawful killing of a human being without malice, "upon a sudden quarrel or heat of passion." Thus, if defendants had engaged in a conspiracy to possess methedrine and killed Mack only "upon a sudden quarrel or heat of passion," they would have been guilty of voluntary manslaughter only. Yet, under

is not inherently dangerous. If the felony is not inherently dangerous it is highly improbable that the potential felon will be deterred; he will not anticipate that any injury or death might arise solely from the fact that he will commit the felony.

The case of *People* v. *Cowan* (1940) 38 Cal.App.2d 231, 244 [101 P.2d 125, 135], cited by respondent, is not inconsistent with this conclusion. That case involved a "conspiracy to injure persons and property."

[5]In determining whether the trial court properly instructed on felony murder we look to the elements of the felony in the abstract, not the particular "facts" of the case. If the felony, as such, is not inherently dangerous the trial court should not instruct the jury that it might serve as a basis for a second degree murder conviction. Any implications to the contrary in *People* v. *Pulley* (1964) 225 Cal.App.2d 366, 373 [37 Cal.Rptr. 376], are disapproved. Of course, we do look to the particular facts of the case in determining whether the instruction prejudiced the defendant.

the instruction,[6] if the jury found only such a conspiracy, it would have been *compelled* to find defendants guilty of second degree murder: defendants would have perpetrated a killing "in connection with" the conspiracy to obtain methedrine even though a sudden quarrel or heat of passion propelled the killing.

We cannot say that in the absence of the erroneous instruction it is not reasonably probable that the jury could have concluded that the argument with Mack led to a "sudden quarrel" which culminated in his death. Although the evidence clearly showed that defendants were seeking methedrine it did not at all definitely disclose the events that preceded the stabbing. No witness testified to the occurrences before the knifing. Defendants themselves, despite some variations in their statements, continuously maintained that the killing emanated from an argument between Hendrix and Mack.

Moreover, the probability that the jury, if it had been properly instructed, might have reached a voluntary manslaughter verdict rather than that of second degree murder, finds support in the legal fuzziness of the demarcation between second degree murder and manslaughter. (See *People* v. *Gorshen* (1959) 51 Cal.2d 716, 730, fn. 11 [336 P.2d 492].) Further, in the instant case the jury, toward the end of their

---

[6]The trial court instructed the jury: "The essential feature that distinguishes manslaughter from murder in the second degree or from any murder is that in manslaughter the killing be done without malice.

"In practical application this means that the unlawful killing of a human being . . . with malice . . . but without a deliberately formed and premeditated intent to kill is murder in the second degree in any of the following cases:

"One, when the killing results from an unlawful act, the natural consequences of which are dangerous to human life, which act is deliberately performed by a person who knows that his conduct endangers the life of another. That would be second degree murder.

"Secondly, . . . when the circumstances attending the killing show an abandoned or malignant heart, then, that would be second degree murder.

"Thirdly, when the killing is done in the perpetration or attempt to perpetrate a violation of Section 245a of the Penal Code, assault with a deadly weapon, or in the violation of Section 182 of the Penal Code, conspiracy.

"Now, if either of those crimes is being perpetrated and there is a killing in connection with it, it's second degree murder, even though the killing was accidental.

"Now, voluntary manslaughter is the unlawful killing of a human being without malice—that's the distinguishment between manslaughter on the one hand and murder on the other—manslaughter is without malice, which is committed—voluntary manslaughter is the unlawful killing of a human being without malice, which is committed upon a sudden quarrel or heat of passion."

(The court went on to explain "heat of passion.")

deliberations, asked the court to clarify the difference between second degree murder and voluntary manslaughter. The possibility of a verdict of manslaughter must have been very much present in the minds of the jury.

III. *Introduction of defendants' statements in evidence*

Defendants contend that their statements to the police should not have been introduced as evidence at the trial. They rely on the principles enunciated in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. In *People* v. *Dorado, supra,* at pp. 353-354, we held that ''defendant's confession should not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights.''

About 9:30 a.m. on May 27, 1963, the day after the killing, defendants phoned the police and told them they were going to turn themselves in.[7] They arrived at the police station later that morning. Inspectors Sutton and Dyer and an assistant district attorney took Williams' statement from 11:50 to 12:45. Then Hendrix gave a statement. The rendition of this statement apparently consumed about the same period of time.

Because the defendants' trial took place before the United States Supreme Court rendered the *Escobedo* decision the circumstances surrounding these statements were not developed. Since we reverse on other grounds, we need not determine the merits of defendants' contention on the barren record before us. ▇▇▇ On remand, if the defendants object to the introduction of their extrajudicial statements,[8] the trial court

---

[7]On the face of the record defendants' remarks on the telephone would not be subject to exclusion under *Escobedo* or *Dorado*. Defendants were not then in custody.

[8]Defendants are not foreclosed from objecting to the introduction of their statements because those statements were, or tended to be, exculpatory. (*People* v. *Nye* (1965) *ante,* p. 166 [45 Cal.Rptr. 328, 403 P.2d 736]; *People* v. *Hillery* (1965) 62 Cal.2d 692 [44 Cal.Rptr. 30, 401 P.2d 382].) Any implications to the contrary in *People* v. *Ulibarri* (1965) 232 Cal.App.2d 51, 55-56 [42 Cal.Rptr. 409], and *People* v. *McDowell* (1965) 234 Cal.App.2d 54, 61-62 [44 Cal.Rptr. 79], are disapproved.

will, of course, consider any evidence which might bear on whether those statements were obtained in violation of defendants' rights to counsel and to remain silent as enunciated in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and determine if any such violation occurred.

The judgments are reversed.

Traynor, C. J., Peters, J., and Peek, J., concurred.

BURKE, J., Dissenting.—The majority reverse these convictions of second degree murder because of misdirection of the jury with respect to certain of the trial court's instructions dealing with a "killing done in the perpetration . . . of . . . [an] assault with a deadly weapon, or in the violation of Section 182 of the Penal Code, conspiracy" (*ante,* p. 457) which classified such offenses as second degree murder instead of manslaughter.

The overwhelming weight of the evidence shows that defendants were extremely fortunate not to have been found guilty of murder in the first degree—and I respectfully submit that to reverse their convictions by the jury of the lesser offense of second degree murder is a miscarriage of justice.

The crime charged was not of a killing in the perpetration of an assault with a deadly weapon or of conspiracy. It was that defendants murdered George Mack.

The court instructed on conspiracy, as it did on a killing as a result of a robbery, or of an assault with a deadly weapon, only because during the trial evidence was adduced from which the jury could have concluded that the killing was in perpetration of any one of such offenses. The court instructed upon other possibilities which conceivably found some support in the evidence, such as the theories advanced by the defendants that the killing was the result of self-defense on their part or of an accident. Thus, when the majority conclude that the trial court erred in such instructions, before reversing the convictions of second degree murder they must comply with the constitutional mandate and decide "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 4½) that "the error complained of has resulted in a miscarriage of justice."

The majority eschew this test, asserting only that "the erroneous instruction caused prejudice to defendants" (*ante,*

p. 458) and that ''We cannot say that in the absence of the erroneous instruction it is not reasonably probable that the jury could have concluded that the argument with [the victim] led to a 'sudden quarrel' which culminated in his death.'' (*Ante,* p. 459.)

The majority acknowledge ''the evidence clearly showed that defendants were seeking methedrine'' but they assert ''it did not at all definitely disclose the events that preceded the stabbing. No witness testified to the occurrences before the knifing.'' (*Ante,* p. 459.) I submit that it was for the jury to determine whether the evidence definitely disclosed what happened before the stabbing. Certainly, there was direct testimony from eyewitnesses which when weighed with the testimony of the defendants was ample to sustain the verdict of the jury.

A review of the evidence shows that defendants conspired in advance to obtain methedrine from their victim and when he resisted the deal they offered him they jointly assaulted him in such a wanton and brutal manner as to result in his death. Both Williams and Hendrix were physically larger and heavier than Mack. So vicious was their assault upon him as to cause bystanders to intercede urging the victim to give defendants whatever it was they were demanding of him. One woman spectator, Rose Johnson, screamed at defendants to let him alone that ''You are going to kill him.'' When her repeated screams failed to stop the assault she called to a woman in the hotel at the place where the fight was in progress, a Mrs. Terry Ritchie, ''There is [*sic*] two hypes down here killing another one.'' Mrs. Ritchie, hearing the screams, looked down from her window and observed that the defendants were standing on either side of their victim who was crouched over and ''looked like he was helpless'' and that she saw a ''knife come out like that in a thrust with the blood dripping from it. . . .'' She telephoned the police. She stated she heard one man say during the fight, ''Why don't you give us the stuff, man? We don't want to kill you.''

Another witness testified to hearing the victim say after having been downed on the sidewalk between his assailants, ''I will give it to you.''

During the fighting one of the defendants plunged his knife in the victim's heart. With the victim dying at their feet, these defendants rifled his pockets, accomplished their objective of obtaining some ampules of methedrine and fled the scene.

It is not difficult to understand the jury's rejection of the defendants' claim that the killing was the result of the exercise of their right of self-defense, although neither would admit to intentionally striking the death blow, since even according to a defense witness the victim, although quarrelsome and irritable since his illness, was in such weakened condition that he needed the witness' assistance, from time to time, in mounting the stairs of his abode.

Defendant Williams corroborated much of the testimony of the eyewitnesses. He acknowledged that Rose Johnson, during the scuffle, urged the victim to give Hendrix "anything if you owe it to him" and later to scream to Mrs. Ritchie to "come down here, they are down here robbing a man. There is two hypes down here—there was two hypes down here robbing a man." He also testified that during the scuffle a further bystander, one Gilmore, interceded to urge the victim "if you owe the fellow anything why don't you pay him."

A city fireman, who came upon the scene, testified that as the victim sank to the sidewalk he saw defendant Williams kick him and that defendants then walked to their car and left the scene.

These brief references to testimony in the record indicate an abundance of evidence to sustain a conviction of first degree murder under the felony murder rule (Pen. Code, § 189—murder committed during the perpetration of a robbery).

The evidence overwhelmingly sustains the conclusion that defendants' conduct was unprovoked. Their acts disclosed "an abandoned and malignant heart," supporting the conclusion that the killing was malicious and thus constituted murder of the second degree. (*People* v. *Jones,* 215 Cal.App. 2d 341, 347 [30 Cal.Rptr. 280].) Likewise, the evidence warranted the instruction that the killing occurred in the course of an assault with a deadly weapon—both defendants having admitted that they pulled out their knives during the fight—thus constituting murder in the second degree and fully warranting the instruction given by the judge on this subject.

There remains only the question of error with respect to the judge's references to a killing which is the result of a conspiracy to obtain methedrine. I respectfully submit that if this constituted error it was hypertechnical and miniscule when weighed on the scales required of us under the California Constitution (art. VI, § 4½).

I submit further that the leniency of the jury in fixing the

crime at a lesser degree than warranted should not be used as a basis for conjecture that conceivably they might have gone even further and found the offense to be voluntary manslaughter but for the allegedly erroneous instruction on conspiracy. I respectfully submit that a review of the evidence precludes the conclusion that there was a miscarriage of justice. Furthermore, under the test of *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243], a review of the entire transcript indicates it is not reasonably probable that a result more favorable to the defendants would have been reached had the errors complained of not occurred.

McComb, J., and Schauer, J.,* concurred.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.