[Crim. No. 414.   Fifth Dist.   Jan. 25, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. PONCIANO M. LOVATO, Defendant and Appellant.

Allan B. O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edsel W. Haws and Raymond M. Momboisse, Deputy Attorneys General, for Plaintiff and Respondent.

GARGANO, J.—Defendant appeals from a judgment of conviction after a jury verdict of murder in the second degree.

Defendant is a 59-year old Mexican National who entered the United States in 1928 and has lived here ever since. Around 10 o'clock in the morning of August 25, 1966, he entered Dr. Shah's reception room to see the doctor; defendant, Dr. Shah's patient, had previously visited the doctor's office about 20 times. When defendant entered the reception room he was stooping slightly, one hand concealed in his coat. He asked to see Dr. Shah and took a seat after the receptionist told him that the doctor was in and would see him shortly. The receptionist then left the room to get defendant's records; glancing down the hall she could see Dr. Shah open the door to a room for defendant. Afterwards the receptionist heard two shots; when she returned to the room she saw defendant standing between the doctor's legs. The receptionist saw defendant eject an empty shell from the pistol he was holding, and then she hid. Later defendant admitted to the police and to a deputy district attorney that he shot the doctor and identified the pistol he used. He stated that he killed Dr. Shah because he believed the doctor's injections were killing him and in fact had killed his eyes and his genitals.

During the trial defendants' counsel informed the court that he intended to offer evidence to show that defendant lacked the mental capacity to act with malice when he shot Dr. Shah, and that at the very most he was guilty of manslaughter, not murder in the second degree. The court opined, however, that defendant was guilty of no less than murder in the second degree and hence was not entitled to show diminished mental capacity since he was an alien in possession of a concealable weapon in violation of Penal Code, section 12021 when the homicide occurred. Moreover, when the court subsequently instructed the jury on manslaughter it modified the standard jury instruction by limiting the jury's consideration of the issue of defendant's diminished capacity as follows: ". . . unless you are satisfied beyond a reasonable doubt that the defendant was an alien intentionally in possession of a concealable firearm, as those terms will be defined for you, at the time of the alleged offense, in which case as a matter of law the offense can be no less than murder in the second degree, even though you may find his mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, harbor malice aforethought." Thus, defendant's main contention for reversal is that the court erred when it rejected relevant evidence and compounded the error

when it modified the standard jury instruction on manslaughter.

Notwithstanding the court's ruling, it is undisputed that there was sufficient evidence of defendant's diminished mental capacity for the jury to have returned a verdict of manslaughter if it had been permitted to consider this factor. Consequently, the real issue is whether the court correctly modified the standard jury instruction on manslaughter. If so, the court also correctly ruled on the admissibility of the evidence. If not, the court committed error of reversible degree when it instructed the jury on manslaughter, and we need not concern ourselves with its ruling on the admissibility of defendant's evidence and the related question as to whether defendant's trial counsel made an adequate offer of proof.

It is settled under the *Wells-Gorshen* rule of diminished capacity that a defendant cannot be convicted of murder if, at the time of the alleged offense, he was operating under a mental disability, not amounting to legal insanity, that prevented him from acting with malice (*People* v. *Wells,* 33 Cal. 2d 330 [202 P.2d 53]; *People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492]). Accordingly, it is reversible error for the trial court to refuse to instruct on manslaughter when there is substantial evidence of defendant's lack of mental capacity to act with malice (*People* v. *Conley,* 64 Cal.2d 310 [49 Cal. Rptr. 815, 411 P.2d 911]). However, an exception is made in the case of felony murders. Thus, if a homicide occurs during the commission of one of the six felonies enumerated in Penal Code, section 189, and the killing has a direct causal relationship to the crime being committed, it is murder in the first degree as a matter of statutory law.

In addition, if a homicide results from the commission of a felony not enumerated in Penal Code, section 189, it is murder in the second degree as a matter of decisional law (*People* v. *Ford* (1964) 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Ford* (1966) 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132]). As to such a homicide the requirement of malice is furnished by the felonious conduct but only if the felony is inherently dangerous to human life (*People* v. *Williams* (1965) 63 Cal.2d 452 [47 Cal.Rptr. 7, 406 P.2d 647]). And, significantly, in making this essential judicial determination the court must look to the elements of the felony in the abstract and not the particular facts of the case (*People* v. *Phillips,* 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]).

Admittedly, defendant committed a felony under Penal

Code, section 12021 when he entered Dr. Shah's office in possession of a pistol.[1] Moreover, it goes without saying that the felony was still in the process of being committed when the killing occurred and that it had a direct causal relationship to the homicide. However, the felony is not one enunciated in Penal Code, section 189. Thus, the remaining question is whether the possession of a concealable weapon by an alien in violation of section 12021 is *per se* a crime which is inherently dangerous to human life in order to invoke the felony-murder second rule.

After long and careful consideration, we conclude that the answer to this basic and fundamental question is in the negative. It is common knowledge that several million aliens are living in this country and that the vast majority are peaceful and law-abiding. Undoubtedly, many are serving or have children serving in the armed forces. Consequently, to categorically hold that every alien who is intentionally in possession of a concealable weapon, regardless of the reason, is guilty of an offense inherently dangerous to human life, and hence is guilty of murder in the second degree if the offense results in a homicide, under every possible circumstance we can visualize, would manifestly lead to unjust and even absurd results. Moreover, to in effect state that a person's citizenship is the controlling factor as to whether a homicide was committed with malice is not only illogical but would constitute an affront to the judiciary which through the years has constantly striven to find compelling reasons rather than arbitrary distinctions before making rules which result in differing treatment of people.

It is of course true that the Legislature, in the exercise of police power, has the right to reasonably regulate the use of firearms and other deadly weapons. Furthermore, as the People point out, in upholding the legislative prerogative to include aliens within the ambit of Penal Code, section 12021 the Supreme Court stated: "In our opinion the legislation constitutes a proper exercise of the police power and is not invalid under the fourteenth amendment. The purpose of the act is to conserve the public welfare, to prevent any inter-

---

[1]Under Penal Code, section 12021 possession of a concealable weapon by an alien is punishable by imprisonment in the state prison or by imprisonment in the county jail or by a fine, or by both a fine and imprisonment in the county jail. However, until sentence is imposed the offense is deemed a felony and remains a felony if no judgment is pronounced (*People* v. *Banks*, 53 Cal.2d 370 [1 Cal.Rptr. 669, 348 P.2d 102]; *People* v. *Lippner*, 219 Cal. 395 [26 P.2d 457]).

ference with the means of common defense in times of peace or war, to insure the public safety by preventing the unlawful use of firearms. It cannot be assumed that the legislature did not have evidence before it, or that it did not have reasonable grounds to justify the legislation, as, for instance, that unnaturalized foreign-born persons and persons who have been convicted of a felony were more likely than citizens to unlawfully use firearms or engage in dangerous practices against the government in times of peace or war, or to resort to force in defiance of the law. To provide against such contingencies would plainly constitute a reasonable exercise of the police power.'' (*In re Rameriz*, 193 Cal. 633, 650 [226 P. 914, 34 A.L.R. 51].)

However, be this as it may, the determination as to whether a felony is inherently dangerous to human life in order to invoke the felony-murder second rule is a judicial, not a legislative, determination (*People* v. *Williams, supra,* 63 Cal.2d 452; *People* v. *Phillips, supra,* 64 Cal.2d 574). Moreover, the fact remains that a violation of section 12021 is not necessarily a penitentiary offense. To the contrary, under ordinary circumstances it is more than likely that an alien who violates the section, at the very most, subjects himself to the imposition of a fine or to a sentence in the county jail. Thus, it is one thing to hold that the legislative mandate prohibiting aliens from possessing concealable weapons as a part of the legislative scheme regulating firearms is a reasonable exercise of the police power. It is another matter entirely to categorically state that the possession of such a weapon by an alien, for whatever purpose and under whatever circumstances, is a felony inherently dangerous to human life.

The People argue that the Supreme Court has already ruled that the possession of a concealable weapon by an ex-felon in violation of Penal Code section 12021 is a felony inherently dangerous to human life and the offense invokes the mandatory felony-murder rule if it results in a homicide. They then assert that there is no distinction between the possession of a concealable weapon by an alien and the possession of a concealable weapon by an ex-felon.

Significantly, all of the cases relied upon by the People are cases in which the ex-felon was also in the process of committing other felonies. For example, in *People* v. *Robillard,* 55 Cal.2d 88 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086], the defendant had stolen an automobile and was in the process of committing this crime when he shot and killed the

police officer. Clearly, the possession of a deadly weapon by an ex-felon when coupled with car theft constitutes a crime inherently dangerous to human life. Moreover, in that case the court was not concerned with the problem of diminished capacity.

As a further example, in both *Ford* appeals (*People* v. *Ford, supra,* 60 Cal.2d 772; *People* v. *Ford, supra,* 65 Cal.2d 41), the defendant, an ex-felon, was not only armed with a concealable weapon when the homicide occurred but he was also caught in the act of kidnapping two people when he killed a police officer. Once again, it is obvious that possession of a concealable weapon by an ex-felon while engaged in the act of kidnapping two victims is a crime inherently dangerous to human life. Thus, although the court held that the defense of diminished capacity was unavailable, it nevertheless used this significant language: ''The evidence other than that related to the murder count amply supports the judgments of conviction of the felonies of kidnaping Roope and Mrs. Ford (Pen. Code, § 207) and of possession of a concealable weapon by an ex-felon (Pen. Code, § 12021, here determined to be a felony as defendant was sentenced therefor to state prison for the term provided by law). These latter crimes are by their nature continuing ones, and were still in the process of being committed when the killing of Officer Stahl took place. They are inherently dangerous to human life, and 'the killing had a direct causal relationship to the crime[s] being committed' [citations omitted]. It follows that under the rule just stated the homicide in the case at bench was, as a matter of law, at least murder in the second degree.'' (*People* v. *Ford,* 60 Cal. 2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].)

In *People* v. *Schader,* 62 Cal.2d 716 [44 Cal.Rptr. 193, 401 P.2d 665], the court merely held that the trial court committed prejudicial error in not giving an instruction on second degree murder since there was substantial evidence in support of the defendant's theory that he was not engaged in the commission of one of the felonies enumerated in Penal Code section 189 when the homicide occurred. There, as in *Robillard,* the court was not concerned with the problem of diminished capacity.

In any event, we conclude that there is a clear, rational and logical distinction between the nature of the offense when committed by an ex-felon and when committed by an alien. An ex-felon by his felony conviction has demonstrated instability and a propensity for crime. Thus, there is a core of

logic in the assumption that if such a person arms himself with a concealable weapon he commits a crime *per se* dangerous to human life. However, a person does not demonstrate instability, nor does he show a tendency toward crime, simply because he is not a citizen of this country. Consequently, although it may be reasonable for the Legislature to include aliens within the ambit of section 12021 for regulatory purposes, it would be illogical and unreasonable for a court to hold that every alien who violates the section necessarily commits a crime inherently dangerous to human life.

In view of the probability of another trial, we make the following brief comments with reference to defendant's contentions that his inculpatory statements were improperly admitted into evidence and that the court committed prejudicial error when it denied his request to close the argument in the sanity phase of the trial.

Defendant does not question the admissibility of the statements which he made when he first entered the police station and announced that he had shot Dr. Shah. These uninvited statements are clearly admissible under the rule articulated in *People* v. *Hines*, 66 Cal.2d 348 [57 Cal.Rptr. 757, 425 P.2d 557]. Moreover, defendant does not assert that he was not adequately advised of his constitutional rights; the record is abundantly clear that he was advised of these rights in accordance with the requirements of *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Defendant contends, however, that the evidence is insufficient to show that he knowingly and intelligently waived his rights before he made the statement to the deputy district attorney which was admitted into evidence over his objection.

It is of course the rule that the prosecution has the burden of showing that a defendant has knowingly and intelligently waived his rights to counsel and to remain silent (*People* v. *Furnish*, 63 Cal.2d 511 [47 Cal.Rptr. 387, 407 P.2d 299]; *People* v. *Lilliock*, 62 Cal.2d 618 [43 Cal.Rptr. 699, 401 P.2d 4]). However, the ultimate determination as to whether a defendant has knowingly and intelligently waived his rights is up to the trial court, and its decision will not be disturbed on appeal unless it is "palpably erroneous" (*People* v. *Stafford*, 240 Cal.App.2d 422 [49 Cal.Rptr. 598]).

We cannot pass on the admissibility of defendant's inculpatory statements if this case is retried for we do not know exactly what evidence will be produced by the prosecution. It suffices to point out that on the basis of the record

before us it is clear that there was sufficient evidence for the trial court to find that defendant knew and understood his constitutional rights and that he knowingly and intelligently waived these rights when he talked to the deputy district attorney. Before taking defendant's statement the deputy district attorney fully advised defendant of his rights and defendant answered in English that he understood. Thereafter, defendant was again carefully advised of his rights through an interpreter. It is true that, when asked by the interpreter if he understood his rights, defendant interrupted on several occasions and kept insisting he wanted to talk about the crime. However, there is ample evidence that he understood and comprehended what was being told to him, and the court's decision that he knowingly waived his rights was not "palpably erroneous."

Defendant also contends that the statement which was read into evidence was objectionable hearsay; the statement was taken through an unsworn interpreter and read into evidence by the reporter who transcribed the proceedings. It is clear, however, that the prosecutor laid an adequate foundation for admissibility under the rule articulated in *People* v. *Sigal,* 221 Cal.App.2d 684 [34 Cal.Rptr. 767], and that defendant's hearsay objection was entirely without merit. Both the interpreter and the reporter testified and authenticated the contents of the transcript before the statement was read into evidence.

With reference to the sanity phase of the trial, it is true, as the People maintain, that our Supreme Court has held on numerous occasions that the order of argument is within the discretion of the trial judge (*People* v. *Cotter,* 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862]). However, the trial court should nevertheless approach the problem with caution. In *Cotter* the defendant did not request permission to close the argument. And in the recent decision of *People* v. *Bandhauer,* 66 Cal.2d 524 [58 Cal.Rptr. 332, 426 P.2d 900], relating to the penalty phase of a criminal trial, the Supreme Court used this significant language at page 530: "The prosecutor's burden of proving guilt beyond a reasonable doubt at the trial on the issue of guilt justifies his closing the argument as well as opening it. At the trial on the issue of penalty, however, neither side has the burden of proving that one or the other penalty is the proper one in the case at hand, and there is no logical reason to favor one side over the other in argument. Equal opportunity to argue is also consistent with the Legislature's strict neutrality in governing the

jury's choice of penalty. [Citation omitted.] Although we are of the opinion that there is no reasonable probability that the sequence of closing argument alone would affect the result [citations omitted], we believe that scrupulous regard for complete impartiality and fairness dictates that the extent of the argument on each side at the trial on the issue of penalty should be equal and that each side should have an opportunity to rebut the argument of the other.''

The judgment is reversed.

STONE, J.—I concur in the result since cases cited in the opinion appear to hold that the defense of diminished capacity to a charge of homicide committed in the perpetration of a felony is restricted to situations where the concomitant felony is not inherently dangerous. Yet for the reasons below, this rule would seem to lead to an anomalous result.

Both diminished capacity and diminished responsibility involve the same basic concept in determining specific intent or malice. It is whether a defendant had the capacity to perform the mental process by which the particular state of mind was formed. In either instance the question is resolved by evidence that a defendant was or was not able to arrive at a particular state or condition of mind by reason of mental retardation, mental disease or deterioration, temporary loss of his faculties through injury or through the use of drugs, including narcotics and alcohol. The Supreme Court recognized this similarity of causal efficacy in *People* v. *Conley*, 64 Cal.2d 310, where, in discussing the defense of diminished responsibility, it said, at page 319 [49 Cal.Rptr. 815, 411 P.2d 911] : ''Implicit in such a defense is also the defense of diminished capacity. The jury could well reject the claim of complete unconsciousness and yet believe that the evidence introduced to establish unconsciousness was sufficient to indicate that defendant's mental capacity was substantially reduced.''

Coming to grips with the cases we note, first, it is well established that diminished capacity may be made an issue in the defense of a felony requiring specific intent. (*People* v. *Ford*, 60 Cal.2d 772, 792 [36 Cal.Rptr. 620, 388 P.2d 892].) Second, under the *Wells-Gorshen* rule diminished capacity can be made an issue where the homicide was not committed in the perpetration of another felony. (*People* v. *Conley*, *supra*.) Third, a defendant charged with a homicide committed in the perpetration of a felony not requiring specific intent but inherently dangerous, such as an ex-felon in posses-

sion of a concealed weapon (*People* v. *Ford, supra,* 60 Cal.2d at p. 795) is precluded from raising the issue of diminished capacity.

The upshot of these three rules is that a defendant charged with a homicide committed in the perpetration of a felony which requires specific intent has a right to raise the defense of diminished capacity to the felony charge. If the trier of fact believes that by reason of diminished capacity he could not form the specific intent to commit the felony, he then stands in the position of one charged with murder without the additional felony charge. Under the *Wells-Gorshen* rule, as explicated in *Conley,* he can raise the defense of diminished responsibility or diminished capacity as to the homicide. (*People* v. *Sievers,* 255 Cal.App.2d 34, 38 [62 Cal.Rptr. 841].) On the other hand, a defendant charged with a homicide committed in the perpetration of a felony which, although inherently dangerous, requires no specific intent is precluded from raising the defense of diminished capacity.

It would seem to be a denial of due process and equal protection of the law to permit a defendant charged with a homicide committed in the perpetration of a felony requiring specific intent, such as robbery, to raise the defense of diminished capacity to the felony and, if successful, to also raise it as to the murder, but to deny the defense to a defendant charged with homicide committed in the perpetration of a felony not requiring specific intent, such as an ex-felon in possession of a firearm.

Thus, it appears to me that a defendant's right to raise the issue of diminished capacity in a felony-homicide case should not rest upon a judicial determination of whether the felony is inherently dangerous (the dissent here) or not so (the majority opinion) but, rather, upon the fact of diminished capacity and its effect.

CONLEY, P. J.—I dissent. It seems clear to me that the trial judge gave the instructions which in the main opinion are found to be prejudicially erroneous in accordance with the rule laid down by the Supreme Court in *People* v. *Ford,* 65 Cal.2d 41, 57-58 [52 Cal.Rptr. 228, 416 P.2d 132], and earlier cases. There it is pointed out that it is not error to refuse to give a manslaughter instruction, even though there was evidence of diminished capacity of the defendant, if as here the felony-murder doctrine is directly involved. In the opinion it is said: "Defendant maintains that it was error to refuse

requested manslaughter instructions because evidence of diminished capacity to form the mental states necessary for murder was introduced. This argument was discussed and dismissed by Justice Schauer when this case was first before us. At that time we held that the homicide was, as a matter of law, at least murder in the second degree. (*People* v. *Ford, supra,* 60 Cal.2d 772, at p. 795.) As Justice Schauer pointed out, a homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes second degree murder. (60 Cal.2d at p. 795.) In our decision in *People* v. *Conley, supra,* 64 Cal.2d 310, which was rendered after Justice Schauer's opinion in the earlier appeal, we held that it was prejudicial error to refuse to instruct on manslaughter in a homicide case where evidence of diminished mental capacity and intoxication was introduced by the defense. The rule that was announced in *Conley,* however, is inapplicable to the facts in the present case. As noted in *Conley,* manslaughter instructions may not be necessary in a case in which diminished capacity and intoxication are relied on by the defense if the felony-murder rule is involved. (*People* v. *Conley, supra,* at p. 324, fn. 4.) Thus, *Conley* does not alter the rule, articulated by Justice Schauer on the previous appeal, that a homicide found to have been perpetrated during the commission of certain felonies cannot be less than murder of the second degree. (See *People* v. *Dorman,* 28 Cal.2d 846, 853 [172 P.2d 686].) In the words of Justice Schauer, 'The evidence other than that related to the murder count amply supports the judgments of conviction of the felonies of kidnaping Roope and Mrs. Ford (Pen. Code, § 207) and of possession of a concealable weapon by an ex-felon (Pen. Code, § 12021, here determined to be a felony as defendant was sentenced therefor to state prison for the term provided by law). These latter crimes are by their nature continuing ones, and were still in the process of being committed when the killing of Officer Stahl took place. They are inherently dangerous to human life, and "the killing had a direct causal relationship to the crime[s] being committed" (*People* v. *Robillard* (1960) 55 Cal.2d 88, 98 [9] [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]). It follows that under the rule just stated the homicide in the case at bench was, as a matter of law, at least murder in the second degree. (*People* v. *Carter* (1961) *supra*, 56 Cal.2d 549 [7b] [15 Cal.Rptr. 645, 364 P.2d 477] [kidnaping] ; *People* v. *Robillard* (1960) *supra,* 55 Cal. 2d 88, 98 [9] [violation of Pen. Code, § 12021].)' (*People* v.

*Ford, supra,* at p. 795.) It was therefore not error for the trial court to refuse to instruct on manslaughter.'' (See also: *People* v. *Ford,* 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 338 P.2d 892] ; *People* v. *Robillard,* 55 Cal.2d 88, 98 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086] ; *People* v. *Schader,* 62 Cal.2d 716, 732 [44 Cal.Rptr. 193, 401 P.2d 665].)

This case presents a situation in which there was a breach of the concealed weapons law which, unquestionably, contributed to the murder.

I should affirm the judgment of the court below.

Respondent's petition for a hearing by the Supreme Court was denied March 20, 1968.