[Crim. No. 7158. First Dist., Div. One. Aug. 14, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. RUBEN
JENKINS, Defendant and Appellant.

LeRue Grim for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and James B. Cuneo, Deputy Attorney Generals, for Plaintiff and Respondent.

SIMS, J.—Defendant, who was convicted of murder of the second degree following a jury trial, and sentenced to state prison following withdrawal of his plea of not guilty by reason of insanity, has appealed from the judgment. He originally contended that there was prejudicial misconduct on the part of the prosecutor in leading the jurors to believe that the case would be one in which the People sought the death penalty, and then appearing to be merciful in only requesting life imprisonment;[1] that the court erred in rejecting an offer of psychiatric testimony to show that persons who have no scruples against the death penalty and who are willing to impose the death penalty are persons who are either consciously or unconsciously prone to be harsh in their judgment;[2] and that he was denied the effective assistance of counsel because his attorney confined his argument to the point of showing the absence of malice aforethought, without

---

[1]Parenthetically it may be noted that there was a lack of objection to the prosecutor's final comments; that the conviction of second, rather than first, degree murder evinces a lack of prejudice; and that the prosecutor's remarks may have been well within the scope of proper comment. The implication of bad faith is countered by the possibility that until all the evidence was adduced the prosecution could not determine what penalty would be sought.

[2]This issue (see *Bumper* v. *North Carolina* (1968) 391 U.S. 543, 545 [20 L.Ed.2d 797, 800, 88 S.Ct. 1788]; *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 516-518 [20 L.Ed.2d 776, 782-783, 88 S.Ct. 1770]; *People* v. *Beivelman* (1968) 70 Cal.2d 60, 78-79 [73 Cal.Rptr. 521, 447 P.2d 913]; *In re Anderson* (1968) 69 Cal.2d 613, 619-620 [73 Cal.Rptr. 21, 447 P.2d 117]; and *People* v. *Ray* (1967) 252 Cal.App.2d 932, 946-953 [61 Cal. Rptr. 1] [hearing in Supreme Court denied, and cert. denied by U.S. Supreme Court (1968) 393 U.S. 864 (21 L.Ed.2d 132, 89 S.Ct. 145)]) was clouded by the failure of the record to reveal the content of an offer allegedly made in chambers at the beginning of the trial.

in any way suggesting that voluntary manslaughter might be an appropriate categorization of the alleged offense.[3]

Prior to the time set for oral argument on appeal the opinion filed in *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580] (see also *People* v. *Fain* (1969) 70 Cal.2d 588, at p. 598 [75 Cal.Rptr. 633, 451 P.2d 65]) rendered erroneous the second degree felony-murder instruction that had been given in this case. The applicability of that decision was then made the subject of further briefing and argument. It is concluded that the erroneous application of the repudiated second degree felony-murder instruction used in this case was prejudicial and requires a reversal. The People's argument that the new doctrine be only applied to cases tried after the date (February 28, 1969) of the decision in *People* v. *Ireland* is rejected. The reversal renders it unnecessary to discuss defendant's contentions predicated upon the selection of jury to try a case involving first degree murder with the death penalty because defendant is no longer subject to that charge or penalty. (See *People* v. *Henderson* (1963) 60 Cal.2d 482, 495-497 [35 Cal.Rptr. 77, 386 P.2d 677].) The question of the adequacy of defendant's representation by counsel is likewise rendered moot.

In this case, as in *People* v. *Ireland,* the jurors were given an instruction based upon CALJIC No. 305 (Revised) which provides in relevant part, ". . . the unlawful killing of a human being with malice aforethought is murder of the second degree in any of the following cases: . . . 3. When the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life, such as an assault with a deadly weapon." (Cf. 70 Cal.2d at p. 538.) The court further defined assault (see CALJIC 602) and assault with a deadly weapon (see CALJIC 604). In *Ireland* the court concluded, "We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included in fact within the offense charged." (70 Cal.2d at p. 539, fn. omitted.)

The People conceded that the instruction as given has since been ruled erroneous. It is contended, however, that the

---

[3]In argument on a motion for new trial the failure to discuss the lesser offense was admitted to have been a tactical choice. (See *People* v. *Reeves* (1966) 64 Cal.2d 766, 772 -774 [51 Cal.Rptr. 691, 415 P.2d 35].)

rule should not be applied to a case tried before it was enunciated, and that in any event the error was not prejudicial in this case.

*Prejudice*

In *People* v. *Fain, supra,* the court recognized the error but ruled that it was not prejudicial in a case in which the sole defense was alibi, rather than diminished capacity (70 Cal.2d at p. 597). In this case there are facts to warrant a finding of diminished capacity.

The defendant testified that he met the victim Mary Williams while both were patients at Agnews State Hospital and that she initiated their common law relationship after both were released from the hospital. The relationship was stormy because of the victim's erratic behavior but defendant never had any inclination to harm her. Defendant was often confused and depressed and had thought about taking his own life on several occasions. The victim had told him that if he ever decided to take his own life that he should kill her as well.

On the morning of December 31, 1966, defendant purchased a shotgun and shells at Sears in San Francisco. The salesman who sold defendant the gun testified that defendant informed him that he wanted to purchase the cheapest shotgun in the store. The salesman convinced defendant that, although the cheapest gun was a single shot, a repeating shotgun was preferable for defendant's avowed purpose—hunting. The salesman further testified that defendant did not appear to have been drinking and appeared rational.

That afternoon, defendant entered Beauty Unlimited, a beauty salon on Presidio Avenue, with a shot gun under his arm, partially covered with his coat. He approached the victim who was employed as a manicurist, addressed her briefly and fired the weapon at her from close range. The owner of the salon testified that as soon as he heard the first shot, he turned toward the sound and saw defendant standing with the gun pointed at the floor. The owner immediately called the police. About 30 seconds later he heard another shot and saw defendant lying on the floor. Defendant got up, stumbled around the shop and fell again. He cried out "somebody finish me off" several times. The owner jumped over him, quickly got the gun, and ran outside.

Police Officers Gerrans and Yeargean arrived and saw the owner with the gun standing in the doorway. They entered the shop and found defendant seated on a chair. As soon as

they entered, defendant said, "I shot her, I did it, I want to die, I wish I had killed myself." The officers placed defendant under arrest and warned him of his *Miranda* rights. Defendant indicated he understood the warning. The officers observed the victim lying on the floor in a pool of blood.

Defendant was transported to Mission Emergency Hospital by police ambulance. The officers overheard defendant tell a psychiatrist that he had gone to Sears to purchase the shotgun with the express purpose of killing his "wife" and that he had discussed the matter of killing her with his sister and friends. Subsequently, while defendant was being treated in the emergency room a police inspector admonished him of his rights and asked him why he had shot the victim. The officer noted alcohol on defendant's breath. Defendant stated that the shooting was the result of domestic quarrels, that it had been coming for a long time, and that he had intended to kill her and commit suicide. Defendant told the officer he had purchased the shotgun about two hours before he shot the victim, that he proceeded to the shop, entered it with the gun under his coat and shot Mary Williams.

Defendant testified that he recalled purchasing the shotgun but did not plan to kill anyone and did not recall killing the victim or attempting to take his own life. He testified that the last thing he remembered prior to the homicide was being in front of the beauty shop and seeing the victim through the window and that he remembered nothing further until he awoke in the hospital.

On the day before the shooting, Mary Williams had called the police to the beauty salon to complain that she was afraid of defendant—that he kept bothering her and kept coming by the beauty salon in his car. She told the police that she had made an earlier report that defendant had beaten her, and that she had made a formal complaint but that no action had been taken.

The defense called defendant's sister, who testified that she had spoken to defendant by telephone on the day of the homicide. He was very upset and crying and said that he was going to kill himself and that the victim had previously asked that he kill her also. She called the police who went to defendant's home and spoke with him. She testified that defendant came to her house later in the day but that she was out. A friend was at defendant's sister's home when defendant arrived. He testified that defendant's clothing was disheveled and that he appeared confused. During the course of the con-

versation defendant said nothing about killing Mary Williams and did not appear to have been drinking.

Two psychiatrists appointed by the court, following defendant's plea of not guilty by reason of insanity, found that defendant was neither psychotic nor suffering from any major mental illness. They testified that defendant had the necessary mental capacity to premeditate the victim's killing.

Dr. Martin Blinder, the defense psychiatrist, examined defendant and the reports of the other psychiatrists and concluded that defendant "committed an illegal act which was the product of a severe mental illness contributed to by an indulgence in alcohol and all kinds of pills, and which came upon him involuntarily." Dr. Blinder further testified that defendant was a "passive personality" and an "inadequate individual" who suffered from a "depressive reaction." He testified that defendant's "hysterical detachment from reality" resulted in a merger of his suicidal and homicidal impulses over which he had no control and which resulted in the homicide in order to remove a source of unbearable psychiatric pain. Dr. Blinder's total contact with defendant was approximately one hour. On cross-examination, Dr. Blinder specifically stated that defendant did not have the requisite mental capacity to premeditate the killing of another human being on December 31, 1966.

The prosecution stressed the second degree felony-murder argument in its opening argument. Defendant attempted to counter with the argument that in any event the defendant would have to have the intent to assault her with a deadly weapon before he could be found to have the requisite state of mind for murder. When the prosecution in closing argument again adverted to the principles in the now proscribed instructions, defendant's counsel, with apparent precognition, objected as follows: ". . . an assault with a deadly weapon is just part of the whole thing, it's not really appropriate." (Cf. *People* v. *Ireland, supra,* 70 Cal.2d at p. 539.)

In its instructions the court pointed out that the defendant contended that he did not have the mental capacity to kill; and that the jury would have to determine whether he was suffering from such abnormal mental or physical condition however caused, which prevented him from forming the specific mental state essential to constitute the crime with which he was charged. More specifically the jurors were given a change in the language of CALJIC 303-A relating to the

mental capacity necessary for first degree murder. (See *People* v. *Fain, supra,* 70 Cal.2d at p. 597, fn. 3.)[4]

After deliberating for about two hours, the jury requested a re-reading of the instructions which the court had given on premeditation. After rejecting a finding of first degree murder, the jury, in arriving at their verdict, must have considered the instructions on second degree murder, which included the now tainted instruction.

On the foregoing record it is concluded that the instruction as given "substantially eviscerated the defense, which was based upon principles of diminished capacity." (*People* v. *Ireland, supra,* 70 Cal.2d at p. 539, fn. 13.) The People's contention that the evidence of diminished capacity should be disregarded because there is little if any evidence to sustain the hypothesis upon which defendant's expert based his opinion and that it is, therefore, not persuasive is more properly addressed to the trier of fact.[5] It is concluded that the error complained of may have resulted in a miscarriage of justice and requires a reversal. "Error in an instruction which ordinarily would not prejudice the rights of a defendant may justify a reversal of the judgment where the jury is misdirected or misled upon an issue vital to the defense and the evidence does not point unerringly to the guilt of the person accused. . . . The question for an appellate court under these circumstances is whether, considering the entire record, the challenged instruction may have prejudiced the convicted person's rights. (Const., art. VI, § 4½ [now § 13].) If it is probable that in the absence of a misleading instruction the jury would not have returned the verdict complained of, then there has been a miscarriage of justice within the meaning of the constitutional provision. [Citations omitted.]" (*People* v. *Rogers* (1943) 22 Cal.2d 787, 807 [141 P.2d 722].)

---

[4]It is unnecessary on this appeal to determine whether the court erred in failing to give on its own motion an instruction on the type of voluntary manslaughter resulting from diminished capacity. (See *People* v. *Fain, supra,* 70 Cal.2d at p. 599; and *People* v. *Morse* (1969) 70 Cal.2d 711, 731-736 [76 Cal.Rptr. 391, 452 P.2d 607]; and cf. *People* v. *Graham* (1969) 71 Cal.2d 303, 310 and 314-316 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Castillo* (1969) 70 Cal.2d 264, 269-272 [74 Cal.Rptr. 385, 449 P.2d 449]; and *People* v. *Lovato* (1968) 258 Cal.App.2d 290, 292-296 and 298-299 [65 Cal.Rptr. 638]. It may be assumed that the instructions given on retrial will conform to those required, on the state of the evidence, by current law.

[5]It may be noted in support of the People's argument that the experienced judge, now deceased, who tried the case, indicated on hearing the motion for new trial that he believed the jury gave the defendant a break in finding second, instead of first, degree murder.

*Retroactivity*

In *People* v. *Ireland,* the court recognized the then prevailing general concept of the felony-murder rule as applied to first and second degree murder as follows: "The felony-murder rule operates (1) to posit the existence of malice aforethought in homicides which are the direct causal result of the perpetration or attempted perpetration of *all* felonies inherently dangerous to human life, and (2) to posit the existence of malice aforethought *and* to classify the offense as murder of the first degree in homicides which are the direct causal result of those six felonies specifically enumerated in section 189 of the Penal Code. (See *People* v. *Phillips* (1966) 64 Cal.2d 574, 582-585 [51 Cal.Rptr. 225, 414 P.2d 353] . . . ; *People* v. *Williams* (1965) 63 Cal.2d 452, 457-458 [47 Cal.Rptr. 7, 406 P.2d 647] . . . ; *People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892] . . . ; *People* v. *Coefield* (1951) 37 Cal.2d 865, 868-869 [236 P.2d 570] . . . ; *People* v. *Valentine* (1946) 28 Cal.2d 121, 135-136 [169 P.2d 1] . . . ; See generally 1 Witkin, Cal. Crimes (1963) §§ 311, 325, pp. 283-284, 295-296.)" (70 Cal.2d at p. 538. In addition to the authorities cited see, *People* v. *Fain, supra,* 70 Cal.2d 588, 598; *People* v. *Lovato* (1968) 258 Cal.App.2d 290 and 298-299 [65 Cal.Rptr. 638]; CALJIC (1958 rev.ed.) Instruction No. 305-A, p. 253, (1967 Cum. Pocket Part) Instruction No. 305 (Revised), and (Dec. 27, 1968 Revision) Instruction No. 305.02.)

The People contend that the limitation put on the operation of the felony murder by *People* v. *Ireland,* and which is quoted above (70 Cal.2d at p. 539) is such a new development in the law that it should only be applied to cases tried after February 28, 1969 when the limitation was pronounced. (See *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 384, fn. 9 [66 Cal.Rptr. 724, 438 P.2d 372] [new standards for change of venue]; and *People* v. *Feggans* (1967) 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21] [requirement of counsel at show up—*United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]].)

In *People* v. *Charles* (1967) 66 Cal.2d 330 [57 Cal.Rptr. 745, 425 P.2d 545], the court considered the scope of the application of the joint trial rules set forth in *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. The opinion noted that it was the settled and historic

pattern of the State Supreme Court and United States Supreme Court to apply the court's current expression of a basic principle to cases pending on appeal and concluded "that convictions should ordinarily be tested on appeal under the law then applicable, not the law prevailing at the time of trial." (66 Cal.2d at pp. 334-337, particularly p. 335. See also *People* v. *Rollins* (1967) 65 Cal.2d 681, 685-691 [56 Cal.Rptr. 293, 423 P.2d 221].) The Supreme Court in analyzing the effect of *People* v. *Ireland* on the facts in *People* v. *Fain,* has in effect applied this general rule. (See 70 Cal.2d at p. 598.)

*In re Dabney* (1969) 71 Cal.2d 1 [76 Cal.Rptr. 636, 452 P.2d 924] adopts the criteria of the United States Supreme Court as the standards to be applied in California in resolving the question of retroactivity. The majority opinion states: "The Constitution neither requires nor prohibits rigid retroactive application of all new developments in constitutional law. (*Linkletter* v. *Walker* (1965) 381 U.S. 618, 629 [14 L.Ed.2d 601, 608, 85 S.Ct. 1731] . . .) In deciding whether to apply the *Woods-Coffey* rule retroactively we must consider the three criteria most recently reiterated in *Stovall* v. *Denno* (1967) 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967] . . . : ' (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.' " (71 Cal.2d at p. 9.)

The purpose to be served by the new limitation is to prevent the evisceration of a defense based upon diminished capacity in cases of homicide resulting from a felonious assault (see 70 Cal.2d at p. 539). If such devitalization of the defense of diminished capacity has in fact occurred because of the instructions given by the court, the search for the truth has been repressed, and the defendant has been denied a fair trial, whether such trial occurred before or after the decision in question.

The authorities first referred to above demonstrate that those charged with the administration of justice had reason to rely upon the unqualified rule when formulating instructions on second degree felony murder. This factor, which goes in the balance for prospective operation, is not conclusive. It may be of relatively more weight when augmented by the administrative disadvantages of opening up convictions long final by collateral attack—a subject not raised by this case.

The effect on the administration of justice of applying the new limitation to cases such as this, in which the judgment is not final, does not require a deviation from the settled and historic pattern. It can only involve those pending cases on which the now erroneous instruction was applied to eviscerate the defense of diminished capacity—certainly a "small" and not a "countless" number of cases (see 71 Cal.2d at p. 10). In most of those cases the evidence should still be fresh (*id.*). In any event, the burdens on the prosecution will be no greater than those which attend the retrial of a case which is necessitated by an error which was cognizable, but uncorrected at an original trial.

No worthy obstacle appears to applying the limitation retroactively to this pending case.

The judgment is reversed.

Molinari, P. J., and Elkington, J., concurred.