[Crim. No. 6491. Fourth Dist., Div. Two. June 13, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD CORRAL MORALES, Defendant and Appellant.

**COUNSEL**

Fred G. Cunard, under appointment by the Court of Appeal, and Victor M. Cox for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Michael E. Lasater, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**McDANIEL, J.**—Defendant was convicted of robbery and first degree murder in connection with a purse-snatching incident. He appeals from the judgment on the verdict rendered in the presence of reversible error in the form of a failure to give a requested jury instruction.

On August 17, 1973, Mrs. Garnet Libby and her mother, Mrs. Minnie Smith, were walking home from the store down a residential street in Anaheim. Defendant passed the two ladies walking in the opposite direction. He then turned and, approaching Mrs. Smith from behind, grabbed her purse and fled down the street. A witness who was standing across the street testified that defendant pushed Mrs. Smith as he seized the purse. Mrs. Smith fell to the ground, suffering a dislocation and fracture of her elbow.

Mrs. Smith was 79 years old. The evidence indicated that before the crime she was in relatively good health and led a very active physical life

for someone of her age. After the purse-snatching incident, Mrs. Smith was taken to a hospital where minor surgery was performed on her elbow. She remained in the hospital for three days and then returned home. Both while in the hospital and during the ensuing two weeks at home Mrs. Smith was less active physically than she had been before the surgery. She did not engage in her customary activities but generally stayed in the house and rested in bed.

The elbow appeared to heal rapidly and did not cause Mrs. Smith any great amount of discomfort. Soon after returning home, however, she began to experience a pain in her left side. The pain became progressively worse, and on September 1 she was readmitted to the hospital. The next morning she died suddenly of a pulmonary thromboembolism (a blood clot in the lung). The embolus apparently originated in the *left leg* and traveled to the lung. Medical testimony indicated that formation of the clot was caused by the physical inactivity of Mrs. Smith while recuperating from the elbow injury.

Defendant was charged with robbery (Pen. Code, § 211) and first degree felony murder (Pen. Code, § 187). It was also alleged that defendant intentionally inflicted great bodily injury upon the victim in the commission of the robbery (Pen. Code, § 213). The jury returned verdicts of guilty of robbery and murder, but was unable to reach a decision on the allegation of intentional infliction of great bodily injury.

We have determined that the trial court erred in refusing to instruct the jury on a lesser included offense, and that the judgment must therefore be reversed.

## DISCUSSION

The trial court instructed the jury on the elements of robbery and first degree felony murder, but refused defendant's requested instructions on grand theft from the person and second degree felony murder. The failure to give these requested instructions was error because the evidence was such that the jury might have entertained a reasonable doubt as to whether defendant used sufficient force in his snatching of the purse for the theft to constitute robbery.

Although several people saw defendant running from the scene with the purse and could identify him as the thief, only one person actually observed the purse-snatching. This witness, a Mrs. Romero, testified that

she saw defendant approach Mrs. Smith from behind and push her with one hand while grabbing the purse with the other. At the time she made this observation Mrs. Romero was standing at a gasoline station across a four-lane boulevard from the crime scene. She was conversing with another lady and also keeping an eye on her young child. She was not gazing constantly in the direction of Mrs. Smith, but turned and witnessed the theft only when the lady with whom she was talking suddenly turned. While she was positive that she saw defendant push Mrs. Smith, she could not recall certain details such as which hand he pushed her with. Several discrepancies were established between her testimony at trial and her earlier statements. Also, according to the testimony of Mrs. Romero as well as other witnesses, it appeared that Mrs. Smith fell *backwards;* that is, she fell towards the direction from which the push allegedly came. Mrs. Romero testified that Mrs. Smith's body "kind of like made a spindle turn" and then fell.

■ Robbery is defined by Penal Code section 211 as the "taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Where the element of force or fear is absent, a taking from the person is only theft; although by virtue of Penal Code section 487 it constitutes grand theft regardless of the value of the property.[1] We have not discovered any California case which purports to define precisely how much force is required to elevate a taking from the person to the status of a robbery. However, it is established that something more is required than just that quantum of force which is necessary to accomplish the mere seizing of the property. In *People* v. *Church,* 116 Cal. 300 [48 P. 125], the court stated: "Grabbing or snatching property from the hand has often been held to be grand larceny, and not robbery." (*Id.,* at p. 303.) In *Church* the defendant was charged with having grabbed a gold watch and chain from the person of another. Several witnesses testified vaguely to seeing "some trouble" between defendant and the victim (*id.,* at p. 301), another that he saw the victim "start back, and his hat fell off." (*Id.,* at p. 302.) The court held that under such evidence "the jury should not have been deprived of the right to find the defendant guilty of grand larceny, if they so saw fit." (*Id.,* at p. 304; see also Annot., Purse Snatching as Robbery or Theft, 42 A.L.R.3d 1381.)

■ "An instruction relating to a lesser included offense is required where the evidence or defense is susceptible of an interpretation, no

---

[1]"Grand theft is theft committed in any of the following cases: 1. . . . . 2. When the property is taken from the person of another. 3. . . . ." (Pen. Code, § 487.)

matter how remote, which if accepted would render the defendant guilty of the lesser included rather than the specifically charged offense." (*People* v. *Stanton,* 274 Cal.App.2d 13, 17 [78 Cal.Rptr. 771].) ". . . a defendant is entitled to instructions on his theory of the case as disclosed by the evidence, no matter how weak." (*People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281].)[2]  ■  We think that the evidence in this case left sufficiently open the question of whether the element of force was present so as to entitle the defendant to have the jury consider the matter. The witness' distance from the event, her preoccupation with other matters, her inability to remember details, and the fact that the victim fell backwards all arguably cast doubt upon the accuracy of her testimony that the defendant deliberately pushed the victim. It is true that the bare fact that Mrs. Smith fell tends to show that she was shoved in some manner. But it is also plausible that she was startled and lost her balance, or that she fell in an attempt to turn and catch a glimpse of the culprit. It is also true that Mrs. Romero was quite positive if not vehement in her assertion that defendant pushed Mrs. Smith. But if the evidence disclosed reasons to doubt this testimony, the witness' expression of certainty could hardly empower the court to ignore those reasons and withdraw the evidentiary issue from the jury. Such reasons did exist here. The circumstances surrounding Mrs. Romero's observation, as well as the rapidity of the event, were such as naturally to give rise to some question regarding the reliability of her perception. Also, her testimony was not entirely consistent with the undisputed evidence as to how Mrs. Smith fell. If, as described by Mrs. Romero, the defendant hit Mrs. Smith from behind "with such a hard force that she fell immediately," it is unlikely that Mrs. Smith would have fallen backwards toward the defendant. Given such reasons to question Mrs. Romero's version of the event, her adamant insistence on the correctness of her testimony could not defeat defendant's right to argue to the jury that she was mistaken. Such careful scrutiny by us is compelled by the extreme importance of this issue in the context of this case. The alleged use of force by

---

[2]The Attorney General argues that an issue or theory is "disclosed by the evidence" so as to entitle the defendant to an instruction only if it is presented by evidence introduced *by the defendant* contradicting the prosecution witnesses. It is urged that the jury's prerogative to disbelieve a prosecution witness cannot alone provide the basis for an instruction on a lesser offense. This argument makes little sense. Carried to its logical extent, it says that no matter how equivocal and uninspiring the prosecution's proof of an element of the greater crime might be, the defendant would not be entitled to an instruction on a lesser offense unless he took the stand and testified or otherwise introduced evidence controverting the prosecution's case. We agree, of course, that the *mere* fact that the jury is always free to reject the testimony of a witness does not require instructions on lesser offenses. But it is different where the evidence, from whatever source, shows facts which form a reasonable basis for doubting the testimony of the prosecution's witness or witnesses.

defendant served not merely to raise the theft offense to a robbery; it was also the sole basis for imputing to defendant the malice for first degree murder.[3]

The trial court therefore erred in failing to instruct on the lesser included offense of grand theft. Such error deprived the defendant of his constitutional right to have the jury determine every material issue presented by the evidence, and it "cannot be cured by weighing the evidence and finding it not reasonably probable that a correctly instructed jury would have convicted the defendant of the lesser included offense." (*People* v. *Sedeno,* 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913].)[4]

Because there is likely to be a retrial in this matter, it is necessary that we consider what effect a finding that defendant committed only grand theft would have on his culpability for the death of Mrs. Smith. At the instant trial, defense counsel requested that the jury be instructed on second degree felony murder in conjunction with the instruction on grand theft, on the apparent assumption that a killing committed in the perpetration of grand theft from the person would be second degree murder. Appellate counsel has adopted this assumption in his argument here. However, this assumption ignores a critical question, namely, whether theft from the person is an inherently dangerous felony such as will support application of the felony-murder doctrine.

■ Under Penal Code section 189 a homicide committed in the perpetration of certain specified felonies, including robbery, is first degree murder. Although the Penal Code does not make any express provision for second degree felony murder, it has long been established that a felony other than those enumerated in Penal Code section 189 may form the basis for a conviction of second degree murder under the felony-murder doctrine. (*People* v. *Phillips,* 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]; *People* v. *Ford,* 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892], cert. den., 377 U.S. 940 [12 L.Ed.2d 303, 84 S.Ct. 1342].) However, beginning with *People* v. *Ford, supra,* a line of

[3]That the jury may have entertained some doubt on this issue of whether the defendant used force is evidenced by their failure to return a guilty verdict on the charge of intentional infliction of great bodily injury.

[4]Plainly, this case falls outside the rule that reversal is not required where it can be determined that the factual issue posed by the omitted instruction was necessarily decided adversely to the defendant under other instructions. (See *People* v. *Sedeno, supra,* at p. 721.) Because it was obvious to the jury that defendant had committed some sort of theft crime, the failure to instruct on the lesser offense effectively precluded consideration of whether defendant used sufficient force to be guilty of robbery.

cases has developed the limitation that a nonenumerated felony will support application of the felony-murder rule only if the felony is inherently dangerous to human life. (See *People* v. *Satchell,* 6 Cal.3d 28, 35-37 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383].) The rationale of this stricture was stated in *People* v. *Williams,* 63 Cal.2d 452, footnote 4 at pages 457-458 [47 Cal.Rptr. 7, 406 P.2d 647]: ". . . 'The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally. . . .' This purpose may be well served with respect to felonies such as robbery or burglary, but it has little relevance to a felony which is not inherently dangerous. If the felony is not inherently dangerous it is highly improbable that the potential felon will be deterred; he will not anticipate that any injury or death might arise solely from the fact that he will commit the felony." In assessing whether a felony is inherently dangerous to human life, the court must look to the elements of the offense in the abstract, not to the particular circumstances of the defendant's commission of the crime. (*People* v. *Satchell, supra,* at p. 36.)[5]

■ The question of whether the offense of grand theft from the person is inherently dangerous to human life would appear, on the surface at least, to have been laid to rest in *People* v. *Phillips, supra,* 64 Cal.2d 574, 580-584.[6] There, the conduct which culminated in a homicide amounted to grand theft by false pretenses. The Supreme Court held that this crime did not qualify as inherently dangerous to human life. However, it is not entirely clear whether the Supreme Court meant its holding to encompass all species of grand theft, or only grand theft by false pretenses. The former interpretation is probably the correct

[5]In the evolution of this and other limitations on the felony-murder doctrine, the Supreme Court has noted on more than one occasion the growing dissatisfaction of both courts and commentators with the felony-murder rule. "In the case of *People* v. *Washington* (1965) 62 Cal.2d 777, at page 783 . . . , this court struck the keynote which has guided all our subsequent consideration of cases involving the felony-murder doctrine. Acknowledging the substantial body of legal scholarship which has concluded that that doctrine not only 'erodes the relation between criminal liability and moral culpability' but also is usually unnecessary for conviction [fn. omitted], we went on to say of it: 'Although it is the law in this state (Pen. Code, § 189), *it should not be extended beyond any rational function that it is designed to serve.*' (Italics added.)" (*People* v. *Satchell, supra,* at pp. 33-34.) And in *People* v. *Poddar,* 10 Cal.3d 750 [111 Cal.Rptr. 910, 518 P.2d 342], the court characterized the doctrine as "a highly artificial concept of strict criminal liability and as a doctrine to be construed as narrowly as possible in light of its purpose of deterring negligent killings during the perpetration of felonies. [Citations omitted.] [Fn. omitted.]" (*Id.,* at p. 756.)

[6]*People* v. *Bauman,* 39 Cal.App.2d 587 at page 591 [103 P.2d 1020], holds that a homicide committed in the perpetration of larceny is second degree murder. However, that case antedated the rule that a felony must be inherently dangerous to human life to support application of the felony-murder doctrine and thus cannot be considered authoritative on this point.

one, since at several points in the opinion the court refers to the offense under consideration as "grand theft," without qualification, and at no point does the court intimate that its decision applies only to grand theft by false pretenses. Furthermore, in *People* v. *Satchell, supra,* 6 Cal.3d 28, the court described the *Phillips* case as "[h]olding that the crime of grand theft, viewed in the abstract, was not inherently dangerous to human life . . . ." (*Id.,* at p. 37.)

Nevertheless, because the Penal Code expressly delineates the taking of property "from the person of another" (Pen. Code, § 487) as an aggravated form of theft deserving of treatment as a felony in all cases, it could be argued that this mode of theft should be analyzed as a distinct offense for purposes of the felony-murder rule. Even adopting this approach, however, we do not think that "theft from the person" is an inherently dangerous felony. It is true that one of the reasons that larceny from the person has historically been treated as a more serious offense is "the greater liability of endangering the person or life of the victim." (*People* v. *McElroy,* 116 Cal. 583, 584 [48 P. 718].) But the question still remains whether there is inherent in the elements of the crime *so* great a danger to human *life* as to warrant imputing to one who commits it the malice which will support a conviction of murder. It is apparent that the offense can readily be perpetrated without any significant hazard to human life; it includes pickpocketing, and lifting property from one lying asleep in a drunken stupor. (See *People* v. *Appleton,* 120 Cal. 250, 251 [52 P. 582].) Only in the unusual case would a taking from the person involve a substantial danger of death without the thief using force against his victim. If the thief does use force, either to effect the taking or to resist the victim's efforts to retrieve the property (see *People* v. *Perhab,* 92 Cal.App.2d 430, 435, 438 [206 P.2d 1133]), the crime becomes robbery, and will support application of the felony-murder rule for that reason. Where the thief abstains from the use of force, he thereby removes the chief source of danger to human life; in such case the purpose of the felony-murder rule, "to deter felons from killing negligently or accidentally" (*People* v. *Williams, supra,* 63 Cal.2d 452), has already been achieved, and thus there would be no rational purpose to be served in extending the doctrine to cover the nonforceful larceny.

We thus conclude that grand theft from the person is not an inherently dangerous felony when viewed in the abstract. If defendant committed only a grand theft, he could not be convicted of second degree murder under the felony-murder rule. This raises the question of whether there is any alternative theory under which defendant might be held criminally liable for the death. ■ The evidence would support the conclusion,

even if defendant did not push Mrs. Smith, that her fall and the injury to her elbow and the ensuing death were proximately caused by defendant's larcenous deed. It would be anomalous to hold, although defendant's unlawful act proximately caused the death that he should bear no criminal responsibility for the homicide.

Manslaughter is defined as "the unlawful killing of a human being, without malice. It is of three kinds: 1. Voluntary . . . 2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; . . ." (Pen. Code, § 192.) The gravamen of the second category of involuntary manslaughter —a killing in the commission of an act "without due caution and circumspection"—is criminal negligence, or conduct which is " 'such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.' " (*People* v. *Penny,* 44 Cal.2d 861, 879 [285 P.2d 926].) We believe that, assuming defendant did not commit a robbery, he could properly be convicted of involuntary manslaughter if his conduct is found to have been criminally negligent.

It might seem that where the conduct resulting in a death constituted a "non-inherently dangerous" felony, the plain words of the statute would preclude defining the homicide as involuntary manslaughter. The statute refers only to killings "in the commission of an unlawful act, *not amounting to felony,*" or "in the commission of a *lawful act* . . . without due caution and circumspection." However, the Supreme Court has indicated that the list of elements of manslaughter in Penal Code section 192 is not exclusive. In *People* v. *Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911], the court held that evidence of diminished capacity could serve to reduce a murder to voluntary manslaughter despite the fact that the code described voluntary manslaughter only as a killing "upon a sudden quarrel or heat of passion." (Pen. Code, § 192.) It was contended that manslaughter is restricted to "homicides having the specific statutory elements prescribed by Penal Code section 192." (*Id.,* at p. 317.) The court responded that this issue had been resolved in *People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492], and described its decision in *Gorshen* as follows: "We thus gave effect to the statutory requirements for the offense of manslaughter, 'the unlawful killing of a human being without malice,' and recognized that since the statute had been enacted before the concept of diminished capacity had been developed, its enumeration

of nonmalicious criminal homicides did not include those in which the lack of malice results from diminished capacity. That enumeration could not be exclusive, for in the absence of malice a homicide cannot be an offense higher than manslaughter. [Citations omitted.]" (*Id.,* at p. 318; see also *People* v. *Mosher,* 1 Cal.3d 379, fn. 1 at p. 385 [82 Cal.Rptr. 379, 461 P.2d 659].) We infer from this language that the basic definition set forth at the outset of Penal Code section 192 is of controlling significance—"Manslaughter is the unlawful killing of a human being, without malice." The enumeration of specific instances of unlawful killings in which malice is deemed lacking is not exclusive, because the Legislature could not have taken into account doctrines relating to the concept of malice which evolved subsequent to enactment of the statute. At the time Penal Code section 192 was adopted commission of the felony of larceny was deemed to imply the malice for murder. (See, e.g., *People* v. *Bauman, supra,* 39 Cal.App.2d 587, 591.) Under notions prevailing today, malice cannot be imputed to one who commits a larceny because that crime is not inherently dangerous to human life. It is thus only consistent with the legislative scheme that a killing committed in the perpetration of theft might be included among the nonmalicious criminal homicides classed as manslaughter.[7]

Upon a retrial of this matter, therefore, the jury can properly be instructed that if they find defendant guilty of only grand theft, they can also adjudge him guilty of involuntary manslaughter if they find that his act was committed "without due caution and circumspection" within the meaning of Penal Code section 192, subdivision 2. (See *People* v. *Penny, supra,* 44 Cal.2d 861, 879-880.)

With one exception, other contentions raised by defendant do not relate to matters which are likely to arise upon a retrial and thus need not be addressed. ■ The exception is defendant's assertion that the trial court erred in allowing the district attorney, over objection, to cross-examine defendant's expert Dr. Root about his testimony in an unrelated case strikingly similar to this one. The prosecutor elicited that in the prior case an elderly lady had been knocked down and her purse

---

[7]See Perkins, Criminal Law (2d ed. 1969) page 70: "And since manslaughter itself is a 'catch-all' concept, including as a matter of common law all homicide not amounting to murder on the one hand and not legally justifiable or excusable on the other, the general outline of involuntary manslaughter is very simple. Every unintentional killing of a human being is involuntary manslaughter if it is neither murder nor voluntary manslaughter nor within the scope of some recognized justification or excuse."

taken; that she had suffered a physical injury; that her death 10 days later was ascribed to pulmonary thromboembolism; that it was the opinion of the county pathologist that the injury caused the death; but that Dr. Root testified for the public defender that there was no causal relationship between the injury and the death. No attempt was made to show any inconsistency between the doctor's testimony in the prior case and his opinion in this one. The Attorney General argues that these facts were admissible to show bias of the witness. We agree with defendant that the cross-examination was irrelevant and should not have been permitted. Although it was permissible to show that the expert had testified on other occasions for the public defender's office, it was going too far to bring out that he had previously stated a similar opinion with reference to similar facts in an effort to cast doubt on the credibility of his testimony. To the extent that it did tend to imply a bias to the jury, it placed upon the defense the unfair burden of justifying Dr. Root's testimony in the prior case as well as this one.

The judgment is reversed.

Kerrigan, J., concurred.

**GARDNER, P. J.**—I dissent.

As the majority correctly states, only one person actually observed the purse snatching—Mrs. Romero—and I will challenge anyone to read Mrs. Romero's testimony and come to any other rational conclusion but that she testified clearly and unequivocally to a robbery, not to a grand theft from the person.

The rule on requested instructions is clear—such instructions must be given if there is any evidence on the issue deserving of any consideration whatever. (*People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281].) But *any* evidence means *some* evidence. "It is not error to refuse a request for instructions on self-defense when there is *no* evidence from which it can be inferred that the defendant feared great bodily harm or death at the hands of the victim, or when the defendant has denied acting in self-defense and claimed the death was accidental. [Citation.]" (Italics added.) (*People* v. *Sedeno,* 10 Cal.3d 703, 718 [112 Cal.Rptr. 1, 518 P.2d 913].)

Mrs. Romero testified that she saw the defendant "push the elderly lady down . . . hit her with such hard force that she fell immediately . . . she kind of made a spindle turn . . . her body actually turned . . . he actually pushed her and at the same time she was pushed she spinned and fell. The force was so great she lost her balance." At the preliminary examination seven months prior to trial, when her memory was even more acute, she had testified, "he grabbed the purse and shoved her at the same time. The woman fell."

On cross-examination, Mrs. Romero never varied an inch from that version. Of course, not having a photographic memory or being blessed with total recall, there were minor uncertainties such as just which hand the defendant used in the attack. Nevertheless, her testimony is clear, unequivocal and uncontradicted that she saw the defendant knock Mrs. Smith down—that he used the force necessary to render this a robbery, not a grand theft from the person. Admittedly, the jury is not bound to follow uncontradicted testimony if there is any basis for disbelieving it. (*People* v. *Anderson,* 243 Cal.App.2d 243 [52 Cal.Rptr. 201].) However, the majority incorrectly elevates the jury's prerogative to disbelieve portions of the witness' testimony into actual evidence. Unless we are to find that Mrs. Romero's testimony is either inherently improbable or incredible, it stands as the *only* evidence concerning the actual purse snatching and it clearly established a robbery.[1] She says the defendant knocked Mrs. Smith down. Reading into this record a theory that Mrs. Smith fell over her feet after being accosted by a careless purse snatcher or bungling pickpocket is pure sophistry.

While it is our duty to search the record for evidence that may be obscure or indistinct, I doubt that it is our responsibility to read into this

---

[1]The defendant did not testify. His version as reflected by his statement to the officers was that he had nothing to do with the incident at all. Actually, the case was tried on two theories—identity of the defendant (he fled) and cause of death—the defendant's strongest defense because of a bungled autopsy. This issue of grand theft from the person amounts to no more than a dropped line in this case. For example, on the public defender's motion for a new trial, 10 short lines were devoted to this issue out of 13 pages of argument. In his responding comments, the trial judge did not even mention the issue. The other issues—alleged judicial misconduct, alleged juror misconduct, alleged evidentiary error, alleged insufficiency of the evidence—were the gut issues on the motion for new trial and on appeal. While I would not reverse on any of them, each has more meat on its bones than the issue on which the majority reverses. It is true that the public defender requested these instructions. As any good trial lawyer would do, he requested instructions at the beginning of the trial on issues that might arise. However, if after hearing Mrs. Romero's testimony he was shocked at the failure of the court to give these instructions, he kept his discomfiture at a low level. A reversal on the grounds chosen by the majority is going to come as quite a surprise to all concerned in this case.

record that which is absurd or preposterous. Were we to do so, we could come up with some truly amazing results.

Assume, for example, a liquor store holdup. The clerk testifies that the defendant shoved a gun in his face, demanded money and took money from the cash register. He testifies that the gun was a pistol and that it was loaded because he could see the ends of cartridges in the cylinder. However, on cross-examination it develops that the clerk has some unfamiliarity with guns and in frustration at a badgering cross-examination, finally, says, "Well, it was just a big, black thing with a hole at the end of it." Also, in an attempt at male braggadocio, he opines that he was not really frightened, only nervous, and that he gave the robber the money only because his employer told him that under, such circumstances he was to give the robber the money and avoid being a hero. From this set of circumstances, assuming requested instructions, we would reverse unless there were an instruction on second degree robbery (it may not have been a gun at all just a big avocado with a hole in it), grand theft from the person (no force or fear), brandishing a weapon (he gave the money away), larceny (the defendant took the money from the cash register, not from the clerk), assault, battery, disturbing the peace, trespass, vagrancy, false imprisonment, a violation of Penal Code, section 650½, and just about any other crime a normally ingenious mind could dream up.

It is clear that the thing that really sticks in the craw of the majority is that the defendant has been convicted of first degree murder for simply pushing an old lady. I must admit that Mrs. Smith, at age 79, probably did not have too many years to live and that the defendant is probably a normal, well-adjusted, well-intentioned, strong arm robber who had no intention of hurting the old lady, let alone kill her. I'll further admit that the vagaries of our law are such that some odd legal results come from some similar physical acts. Leaving out the robbery, but assuming the death resulted from the pushing, if the defendant knocked Mrs. Smith down because he did not like her, that would, generally speaking, be murder. If he knocked her down just for the hell of it, that would, generally speaking, be manslaughter. If he knocked her down accidentally, that would, generally speaking, be no crime at all. But whatever the courts may think of any extension of the felony-murder rule, the Legislature has made one thing very clear in Penal Code, section 187. One may rob, burgle, rape, burn, maim or molest and only suffer the consequences of that crime as set forth in the particular code section. If, however, during the perpetration of one of those offenses, the victim

dies, then, to quote a recent deathless line from Telly Savalas in *Kojak,* "That's murder one, baby."

I find the rest of the contentions made by the defendant unconvincing and could I get one more vote I would affirm.

A petition for a rehearing was denied July 1, 1975, and respondent's petition for a hearing by the Supreme Court was denied August 6, 1975. McComb, J., Clark, J., and Richardson, J., were of the opinion that the petition should be granted.