Filed 7/29/14  P. v. Blaylock CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

| | |
|---|---|
| THE PEOPLE, | C072780 |
| Plaintiff and Respondent, | (Super. Ct. No. SF119757A) |
| v. | |
| ANTHONY AARON BLAYLOCK, | |
| Defendant and Appellant. | |

A jury found defendant Anthony Aaron Blaylock guilty of carjacking (Pen. Code,[1] § 215, subd. (a); count one), robbery (§ 211; count two), and possession of cocaine (Health & Saf. Code, § 11350, subd. (a); count three).  It also found true allegations defendant (1) knew or should have known the victim in count one was over 65 years old (§ 667.9, subd. (a)), and (2) used a knife in the commission of count two (§ 12022, subd. (b)).  In a bifurcated proceeding, the jury found true allegations defendant had five prior strike convictions (§§ 1170.12, subd. (b), 667, subd. (b)) and three prior serious

---

[1] Further undesignated references are to the Penal Code.

felony convictions (§ 667, subd. (a)(1)) in connection with counts one and two, and one prior strike conviction in connection with count three.

Defendant was sentenced to 70 years and 4 months to life in state prison, consisting of 27 years to life on count one, plus an additional year for the elderly victim enhancement and an additional 5 years for each of the three prior serious felony enhancements; a consecutive 25 years to life on count two, plus an additional one year for the knife enhancement; and a consecutive 16 months on count three.

Defendant appeals, contending the trial court (1) prejudicially erred in refusing to instruct the jury on theft as a lesser included offense of robbery; and (2) abused its discretion in allowing defendant to be impeached with a 1995 robbery conviction. Finding no error, we shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I
The Prosecution

On March 3, 2012, 68-year-old Eva Dunn stopped at the Taco Bell restaurant on Hammer Lane in Stockton to use the restroom. On her way back to her car, a blue Ford Escape sport utility vehicle (SUV), she noticed a man walking past her. He was wearing a sweatshirt, jeans, and "some type of cap" on his head and appeared to be Black. As she opened her car door, the man asked her for money "to feed his wife and two kids." Dunn started to give him money, but before she could close her car door, the man was "right up against [her]." She told him to get away, pushed him, and started screaming. The man told her to "shut up." The next thing she remembered was being on the ground and watching the man drive away in her car.

A few days later, Dunn identified defendant in a photographic line-up; she was "a hundred percent" certain defendant was the man who took her car. At trial, she had no doubt defendant was the person who took her car. Defendant looked different in court

2

than he did on the day of the carjacking. At the time of the carjacking, he looked "scruffy," he was not clean shaven.

Tylasha Vaughn was in the parking lot when Dunn was returning to her car. She saw a man approach Dunn. At first, the man stood outside Dunn's car while Dunn sat in the driver's seat but then the man "grabbed [Dunn's] wrist and slammed her to the ground." The man then got into Dunn's car, closed the door, and drove away. He was wearing a hoodie sweatshirt and jeans, and he had "scruffy" looking black and gray facial hair. Vaughn later identified defendant as the person who took Dunn's car. She picked defendant out of a photographic line-up a few days after the carjacking; she was 90 percent sure defendant was the man who took Dunn's car. At trial, she had no doubt defendant was the man who took Dunn's car. Defendant looked different in court than he did at the time of the carjacking; he was more cleanly shaved in court.

On March 4, 2012, shortly after 7:00 p.m., Yolanda Ortiz was talking with her friend Irene Constancio in the Big Lots parking lot on Country Club Lane in Stockton when a blue Ford SUV pulled up and parked nearby. Moments later, a man came up behind Ortiz, placed his arm around her shoulder and neck area, and whispered, "Give me your purse. I have a knife, and I will use it." Ortiz looked towards the man and saw something sharp in his hand. When Ortiz did not immediately react, the man repeated his threat. The man and Ortiz then engaged in a tug-of-war over the purse. Ortiz had a hold of one strap, and the man had a hold of the other with one hand while swinging a knife in the other. As the two struggled, Ortiz began to lose her grip on a bag of items she had purchased and momentarily let go of her purse strap. At that point, the man took off with her purse, ran straight to the blue Ford SUV, and drove away. Ortiz described the man as Black, with a light to medium complexion, and a "scrubby" face, like he "hadn't shaved in a few days." He was wearing a "beige/tannish shirt" and dark pants. He was about six feet tall and weighed about 140-145 pounds.

3

Ortiz's daughter Yolanda Navarro, who was with Ortiz at the time, gave a similar description of the man who took her mother's purse. She said he was "multi-racial," maybe Black and White, "light skinned," and "scruffy looking," with some facial hair. He wore a beige polo shirt and jeans. He was about six feet tall and weighed about 150-160 pounds.

Constancio described the man as a light-skinned Black man, about six feet tall, and weighing 200 pounds. She did not recall him having any facial hair but did recall he was wearing a beige shirt. She picked defendant out of a photographic line-up but said she was less than 100 percent certain he was the man who took Ortiz's purse. At trial, she was 85 percent certain that defendant was the man who took Ortiz's purse.

A few hours after the incident in the Big Lots parking lot, Stockton Police Sergeant Richard Maddern saw Dunn's blue Ford Escape parked on the street in the area of Harding and Airport and West Lane in Stockton. As he drove by, he saw a Black man in the driver's seat of the car. When he returned seconds later, the car was empty. He did not see anyone on the street but noticed a white gate was open. Once backup arrived, Maddern and another officer searched the residences through the open gate. They found defendant and Ortiz's driver's license at the top of a staircase. Defendant had a "crack pipe," white latex gloves, and Ortiz's ATM debit card in his pant pocket. Inside Dunn's car, officers found a knife tucked behind the passenger seat, white latex gloves, car keys that did not fit Dunn's car, and shaving razors. Evidence technicians found defendant's fingerprints on the outside of the driver's door and on a CD case inside Dunn's car.

Officers estimated defendant's height as six feet and his weight as 250.

Ortiz and Navarro were brought to the scene for an infield show-up. Neither was sure if defendant was the man who stole Ortiz's purse because the lighting was different, and defendant looked different. Both believed defendant changed his appearance between the time he stole Ortiz's purse and the infield show-up by shaving his head and face. Ortiz and Navarro identified Dunn's car as the car driven by the man who stole

4

Ortiz's purse.  Ortiz and Navarro also identified the knife found inside the car as the one used by the man who stole Ortiz's purse, and Ortiz identified the car keys, driver's license, and credit cards found in defendant's pocket and inside the car as belonging to her.  At trial, Ortiz and Navarro were certain defendant was the man who stole Ortiz's purse.

During the booking process at the jail, officers found 1.29 grams of a substance containing cocaine base rolled up in defendant's pant leg.

## II
## The Defense

The defense called Stockton Police Officer Jesus Gonzalez, who was present at the infield show-up.  Navarro told Gonzalez, "It could be him, but I'm not sure."  She may also have said she could not be sure because "[i]t's too dark out here, I can't see."  Ortiz told Gonzalez, "It looks like him, but I can't be sure."  She also may have said, "It could be him, but he looks darker now."

Defendant testified he was not in the Taco Bell parking lot on Hammer Lane on March 3, 2012, or the Big Lots parking lot on March 4, 2012, and denied taking Dunn's car or Ortiz's purse.  On March 3 defendant was hanging out near a homeless shelter he frequents and visiting with his disabled brother, and on March 4 he was caring for his brother until about 4:00 or 5:00 p.m.  After that, he took a bus to Pacific and Harding Way, bought a wine cooler at a liquor store, and walked towards his friend April's home at Harding and Airport Way.  On the way there, he heard music coming from a blue car and saw a Hispanic/White man sitting inside the car and a Black, bald man standing outside the car.  The Black man asked him if he had an "ID," and if he knew anyone who could cash a check.  The conversation soon turned to drugs, and the Black man asked defendant if he had any drugs for sale.  Defendant said he did and asked the Black man if he had a glass pipe.  The man indicated that he did, and defendant asked him how much he wanted to buy.  Defendant placed a rock of cocaine onto a CD case, broke it, reserved

5

some for himself, and passed the rest to the man.  One of the men paid defendant, and defendant smoked some of the cocaine he had saved for himself.  When he finished, he saw some credit cards on the ground, picked them up, and put them in his pocket.  The Black man then asked defendant if he knew anyone who needed gas, explaining that he could get them gas at half-price by using an ATM card, which only required a ZIP code.

The two men were spooked when a police car drove by and ran inside a white gate and towards some apartments.  Defendant followed and picked up a driver's license dropped by one of the men.  Defendant lost sight of the two men and ultimately was arrested at the top of a landing.

On cross-examination, defendant acknowledged telling an officer at the scene that he had not been inside the blue SUV and that there was no reason they would find his fingerprints inside the car.  Defendant also admitted having six felony convictions, including one for robbery in 1995.  He denied using robbery as a means of making money.

## DISCUSSION

### I
### The Trial Court Did Not Err in Refusing to Instruct the Jury on Theft as a Lesser Included Offense of Robbery

Defendant contends the trial court erred in refusing to instruct the jury on theft as a lesser included offense to robbery because there is a question as to whether he used force or fear to obtain Ortiz's purse.  As we shall explain, there is no evidence from which the jury could have found defendant committed a theft, yet found the element of force absent.  Accordingly, the trial court did not err in refusing to instruct the jury on theft.

Defendant's trial counsel requested a theft instruction based on the alleged lack of sufficient force or fear to constitute a robbery.  The trial court declined to instruct on the lesser included offense of theft, stating:  ". . . I can't see an element of a greater, either in

6

Count One [(carjacking)] or Count Two [(robbery)], that's missing such that we drop down to some kind of lesser included offense."

A defendant has a constitutional right to have the jury determine every material issue presented by the evidence. (*People v. Benavides* (2005) 35 Cal.4th 69, 102.) A trial court must therefore "instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149.) "On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*Id.* at p. 162.) " ' " 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " ' [Citation.]" (*People v. Benavides*, *supra*, 35 Cal.4th at p. 102.) Where the evidence is but " 'minimal and insubstantial,' " the trial court need not instruct on a lesser included offense. (*People v. Barton* (1995) 12 Cal.4th 186, 201.)

Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear. (§ 211; *People v. Gomez* (2008) 43 Cal.4th 249, 254.) Theft is a lesser included offense of robbery, which does not require the additional element of force or fear. (*People v. Combs* (2004) 34 Cal.4th 821, 856; *People v. Turner* (1990) 50 Cal.3d 668, 690; *People v. Reeves* (2001) 91 Cal.App.4th 14, 51.) If property is taken without the use of force or fear, the offense is theft, not robbery. (*People v. Reeves*, *supra*, at p. 53.) The amount of force required to elevate a taking from the person to a robbery has is something beyond "just that quantum of force which is necessary to accomplish the mere seizing of the property." (*People v. Morales* (1975) 49 Cal.App.3d 134, 139 (*Morales*).)

Here, defendant claims that a juror reasonably could conclude he "did not use sufficient force to take the purse from Ortiz" because "she relinquished her hold voluntarily in order to secure the bag she had on her other arm." The claim is not well taken.

7

The only evidence is that Ortiz relinquished her hold on her purse during the course of a tug-of-war with defendant. After coming up behind Ortiz, placing his arm around her shoulder and neck area, brandishing a knife, and pulling Ortiz's purse off of her shoulder, defendant and Ortiz engaged in a tug-of-war during which defendant swung the knife and Ortiz demanded defendant let go of her purse. During the tug-of-war, Ortiz began to lose her grip on a bag she had in her other arm and "let go of [her] purse to grab the bag." "And that's when [defendant] took off with it." On this record, there is simply no scenario by which defendant could have come into possession of Ortiz's purse that can be divorced from the element of force. Defendant's claim that he obtained possession of Ortiz's purse as a result of her "voluntarily" letting go of the same mischaracterizes the incident. As the People correctly note, Ortiz "described trying to prevent one bag from falling during the struggle that was initiated by [defendant]. There was nothing 'voluntary' about it; [defendant] took advantage of the victim's repositioning her items."

In *People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1411 (*Cooksey*), the court held that "[t]here [was] no substantial evidence defendant merely committed the included offense of grand theft from the person" where the uncontradicted evidence indicated that the defendant physically grabbed the victim, the victim and the defendant struggled for two minutes before he successfully ran off with her purse, and as he ran away, the victim screamed at the defendant. Accordingly, the court found the trial court did not err in refusing to instruct on grand theft as a lesser included offense of robbery.

In reaching this conclusion, the court distinguished the two cases relied upon by defendant in this case: *People v. Roberts* (1976) 57 Cal.App.3d 782 (*Roberts*) and *Morales, supra,* 49 Cal.App.3d 134. (*Cooksey, supra,* 95 Cal.App.4th at pp. 1412-1413.) In *Roberts*, the evidence established that someone came up behind the victim, jerked on her handbag, snapping the handle, and ran off with it. (*Id.* at p. 785.) The court held: "Certainly, the evidence that the purse was grabbed with such force that the handle broke supports the jury's implied finding that such force existed," (*id.* at p. 787) it noted that it

8

also "is susceptible of an interpretation (perhaps remote) which, if accepted, would render the defendant guilty of the lesser included offense of grand theft from the person. [Citation.] Consequently, if an instruction on such lesser included offense is requested on retrial, it must be given." (*Id.* at p. 787, fn. 1.)

In *Morales,* the defendant approached the victim from behind, grabbed her purse and fled down the road. (*Morales, supra*, 49 Cal.App.3d at pp. 137-138.) A witness who was standing across the street at the time the victim's purse was taken testified that the defendant pushed the victim down in the process. (*Id.* at pp. 140-141.) The court concluded that an instruction on grand theft as a lesser included should have been given because "the evidence in this case left sufficiently open the question of whether the element of force was present so as to entitle the defendant to have the jury consider the matter. . . . The circumstances surrounding [the witness's] observation, as well as the rapidity of the event, were such as naturally to give rise to some question regarding the reliability of her perception." (*Id.* at p. 140.)

In *Cooksey,* the court found the facts in *Roberts* and *Morales* were "far different" from those involved in *Cooksey*. (*Cooksey, supra*, 95 Cal.App.4th at pp. 1412-1413.) *Roberts* and *Morales* involved "momentary grabbing of the purse" or "momentary contact with the victim," "not a two-minute struggle" as was the case in *Cooksey*. (*Cooksey,* at pp. 1412-1413.)

Defendant claims the present action is like *Roberts* and *Morales* because "the evidence supports a finding that the interaction, the tug of war, between [defendant] and Ortiz was 'momentary,' " citing Ortiz's testimony that the struggle "could have been seconds. It could have been . . . a minute," and Constancio's testimony that the confrontation lasted "less than ten seconds." We are not persuaded. As the People correctly observe, "This was not a pick-pocket or purse snatch where the thief solely and momentarily grabbed the item to be stolen and had only incidental contact with the victim." As detailed above, the interaction between defendant and Ortiz included

9

defendant grabbing Ortiz around the neck and shoulder area, brandishing a knife, and engaging in struggle with Ortiz over the purse. On this record, no juror reasonably could conclude that defendant used "just that quantum of force which is necessary to accomplish the mere seizing of the property." (*Morales, supra,* 49 Cal.App.3d at p. 139; see also *People v. Burns* (2009) 172 Cal.App.4th 1251, 1257 ["where a person wrests away personal property from another person who resists the effort to do so, the crime is robbery, not merely theft"].)[2]

Accordingly, the trial court properly did not instruct on theft as a lesser included offense of robbery.

## II
## The Trial Court Did Not Abuse Its Discretion in Allowing Defendant to be Impeached with a 1995 Prior Conviction for Robbery

Defendant next argues the trial court abused its discretion by admitting evidence of his 1995 robbery conviction for purposes of impeachment. We disagree.

Defendant moved in limine for an order prohibiting the prosecution from impeaching him with his six prior robbery convictions. At issue were one robbery conviction in 1988, four in 1990, and one in 1995. Defendant's trial counsel argued that the admission of such evidence would be "[e]xtremely prejudicial" because defendant is charged with robbery and carjacking, a form of robbery, in the present case, and thus, there was a danger "the jurors would improperly consider [the prior convictions] not for credibility, but basically for . . . MO" or character. Defendant's trial counsel added that the relevant jury instructions were "deficient in that they don't . . . specifically tell the jury that you can't consider these prior felony convictions for character or disposition evidence." Finally, if the trial court was inclined to admit the priors, defendant's trial

---

[2] Because we conclude no juror reasonably could conclude the taking of Ortiz's purse was not accomplished by force, we need no address the fear element.

10

counsel requested they be sanitized "to only that he had a felony conviction on a certain date."

The trial court ruled that it would allow the prosecution to impeach defendant "with the fact that he does have . . . six prior felony convictions," including one for robbery in 1995. The court began its analysis by determining that the prior robberies involved moral turpitude. It then engaged in "balancing the prejudicial versus the probative value" as required under Evidence Code section 352. In doing so, it found that the prior convictions were "not really that remote" because while they dated back 24 years, defendant was in custody for a significant period since that time.[3] The court acknowledged that the fact the prior convictions involved "the same type of offense[s]" charged in the present case was "an issue" but found the nature of the prior convictions was relevant and that it could offset any undue prejudice by sanitizing five of the six prior offenses. The court explained, "Credibility is a big issue here. So [the prosecutor] can say, in essence, You've got five other felony convictions, correct, sir? And, in fact, there's one additional one, it's a [section] 211 in '95, in this jurisdiction. That is how many years ago? That's 17 years ago. And I think that puts it in its proper perspective. [¶] Yes, it's prejudicial, but also it's highly probative. . . . If [defendant] testifies along the lines of his statement to the officers, then the jury has a right to put everybody's statements in proper context, vis-à-vis not character evidence, not common plan, motive or scheme, but credibility."

During cross-examination, the prosecutor asked defendant, "Sir, you have six felony convictions, don't you," and defendant responded in the affirmative. The prosecutor then asked defendant if "one of them includes robbery from '95," and defendant again responded in the affirmative.

---

[3] As detailed by the court, "There was the 11 year, eight month sentence in '95 alone, and . . . at least five . . . parole violations, '05, '06, '07, [and] two in '08."

11

After the close of evidence, the jury was instructed in pertinent part that "certain evidence was admitted for a limited purpose," and that the jury "may consider that evidence only for that purpose and for no other." The jury was further instructed that "[i]f you find that a witness has committed a crime or other misconduct -- and this is the issue they both talked about, credibility -- you may consider that fact only in evaluating the credibility of the witness' testimony."

Our Supreme Court recently summarized the principles governing the admission of prior convictions for impeachment: " ' "[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude." ' [Citation.] Beyond this, the ' "trial courts have broad discretion to admit or exclude prior convictions for impeachment purposes . . . ." ' [Citation.] 'When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify.' [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 722.)

Defendant does not dispute that his prior crimes involved moral turpitude suggesting "a willingness to lie." (*People v. Wheeler* (1992) 4 Cal.4th 284, 295; see *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925 [prior convictions for burglary, robbery, and other theft-related crimes are probative of credibility].) Rather, he argues that the court abused its discretion in permitting the prosecutor to impeach him with a prior conviction that was identical to one of the charged offences and similar to another. He is mistaken. "Although the similarity between the prior convictions and the charged offenses is a factor for the court to consider when balancing probative value against prejudice, it is not dispositive." (*People v. Clark* (2011) 52 Cal.4th 856, 932.) Here, the trial court found the robbery convictions highly probative of defendant's credibility but acknowledged that their similarity to the current charges was "an issue." To mitigate any

prejudice to defendant, the court sanitized five of the six prior robbery convictions but permitted the prosecutor to note that one of the six, namely the 1995 conviction, was for robbery. The trial court found that sanitizing all of defendant's prior robbery convictions, as he requested, would have clothed defendant in a false aura of veracity. The record shows that the court amply considered the prejudicial effect of prior crimes evidence and was concerned about probative value. It also shows that the court engaged in a weighing process in deciding to sanitize five of the six prior robbery convictions. Finally, it instructed the jury that it could consider such evidence "only in evaluating the credibility of the witness' testimony." On this record, we conclude the trial court acted well within its discretion in refusing to sanitize one of defendant's six prior robbery convictions.

## DISPOSITION

The judgment is affirmed.

     BLEASE     , J.


We concur:


     RAYE     , P. J.


     MURRAY     , J.